**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) | |
| 40 West 20th Street | ) | |
| New York, NY 10011 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 23-cv-982 |
| v. | ) | |
| | ) | |
| GINA M. RAIMONDO, in her official capacity as | ) | |
| Secretary of the Department of Commerce | ) | |
| Department of Commerce | ) | |
| 1401 Constitution Avenue, NW | ) | |
| Washington, D.C. 20230 | ) | |
| | ) | |
| JANET COIT, in her official capacity as Assistant | ) | |
| Administrator for NOAA Fisheries | ) | |
| Department of Commerce | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| NATIONAL OCEANIC AND ATMOSPHERIC | ) | |
| ADMINISTRATION | ) | |
| Department of Commerce, Room 5128 | ) | |
| 1401 Constitution Avenue, NW | ) | |
| Washington, D.C. 20230 | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES SERVICE | ) | |
| Department of Commerce, Room 14555 | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| AMERICAN SPORTFISHING ASSOCIATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**[PROPOSED] SUPPLEMENTED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiff Natural Resources Defense Council ("NRDC") on behalf of its adversely affected members hereby challenges the unlawful decision of the National Marine Fisheries Service ("NMFS") to approve the Mid-Atlantic Fishery Management Council's ("the Council") Framework Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan ("Framework 17"), and the final NMFS rule applying Framework 17 to the 2023 recreational management measures for the summer flounder, scup, and black sea bass fisheries ("2023 Recreational Management Measures"), because they fail to comply with the annual catch limit requirement as mandated by the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1891d ("Magnuson-Stevens Act" or "the Act"), and violates the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").

2.      NRDC requests that this Court vacate Framework 17 and require NMFS to implement revised recreational harvest levels and management measures for the summer flounder, scup, and black sea bass fisheries that are in conformance with the Magnuson-Stevens Act.

**JURISDICTION AND VENUE**

3.      This action arises under the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1891d, and the APA, 5 U.S.C. §§ 701-706.

4.      This Court has jurisdiction over this action pursuant to the Magnuson-Stevens Act, which provides that "[t]he district courts of the United States shall

2

have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. § 1861(d). The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." *Id.* § 1855(f).

5.      Defendants published Framework 17 on March 9, 2023, in the Federal Register. Plaintiff filed this Complaint within thirty (30) days of publication in accordance with Federal Rule of Civil Procedure Rule 6. Defendants published the 2023 Recreational Management Measures on August 15, 2023, in the Federal Register.

6.      Defendants' issuance of Framework 17, as well as the 2023 Recreational Management Measures, are "agency actions" subject to judicial review under the APA. 5 U.S.C. §§ 701, 704.

7.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

8.      Venue is properly vested in this judicial district under 28 U.S.C. § 1391, because Defendants are officers or employees of the United States and reside in this district, and because a substantial part of the events and omissions which gave rise to this action occurred in this district.

3

## PARTIES

9.     Plaintiff Natural Resources Defense Council ("NRDC") is a national, not-for-profit membership corporation with its principal place of business in New York, New York. Founded in 1970, NRDC represents hundreds of thousands of members nationwide. One of NRDC's institutional purposes is conservation of the ocean and ocean resources, including ensuring healthy fish populations. NRDC has long been active in efforts to protect these natural resources from harm (including harm through overfishing), to rebuild depleted fisheries, and to promote fishery management policies in the United States that improve sustainability and mitigate adverse ecological impacts of fishing. During the 2006 Congressional amendments to the Magnuson-Stevens Act, NRDC's advocacy helped to secure a mandate for the use of annual catch limits as the primary tool to prevent overfishing in all federal fisheries.

10.     NRDC submitted detailed comments to Defendants on Framework 17 and the 2023 Recreational Management Measures and brings this action on its own behalf and on behalf of its affected members. NRDC and its members have a direct interest in maintaining healthy levels of summer flounder, scup, and black sea bass (together, "the affected stocks") and protecting the stocks' role in the marine ecosystem in the Mid-Atlantic Region.

11.     NRDC has members that reside near or along, or enjoy visiting, the Mid-Atlantic coast, and who use and enjoy the ocean for fishing, wildlife observation, boating, research, and study. NRDC's members value and depend on

healthy fish stocks for these activities. NRDC's members also consume seafood, including summer flounder, scup, and black sea bass. NRDC's members are directly affected by management actions that fail to comply with the annual catch limit requirement. Injuries to NRDC's members include injuries to their consumption and recreational use of the summer flounder, scup, and black sea bass stocks.

12.     For example, NRDC member Charles Witek is a resident of West Babylon, New York, and is an active saltwater angler who currently owns and operates a boat docked in Babylon, New York. He frequently fishes recreationally for summer flounder, scup, and black sea bass in federal waters. Mr. Witek derives significant enjoyment from fishing for these stocks and has a strong interest in maintaining healthy levels of these stocks and protecting their role in the marine ecosystem, including through the application of annual catch limits to prevent overfishing. Mr. Witek and his family also regularly enjoy eating the fish that he harvests pursuant to recreational management measures, including applicable seasons and length and bag limits. Mr. Witek stands to be particularly injured because, by failing to comply with the annual catch limit requirement, Framework 17 and the 2023 Recreational Management Measures threaten unsustainable fishing of the affected stocks which would impact Mr. Witek's recreational activities. This harm can be addressed by vacating Framework 17 and the 2023 Recreational Management Measures and requiring NMFS to implement management measures for the affected stocks in conformance with the Magnuson-Stevens Act.

13.    Defendants' violations of the Magnuson-Stevens Act and the APA, by removing annual catch limits as a constraint on recreational fishing mortality, harm NRDC and its members' interest in protecting healthy levels of the affected stocks and the stocks' role in the marine ecosystem. The aesthetic, conservation, recreational, and other interests of NRDC and its members have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely affected and irreparably injured by Defendants' failure to comply with the law in its management of the affected stocks. These injuries are actual and concrete and would be redressed by the relief NRDC seeks here. NRDC has no adequate remedy at law.

14.    The Defendants in this action are:

a.    GINA M. RAIMONDO, United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce. She is sued in her official capacity.

b.    NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA) is an agency of the Department of Commerce with supervisory responsibility for NMFS. The Secretary of Commerce has delegated responsibility to implement and enforce compliance with the Magnuson-Stevens Act to NOAA, which in turn has sub-delegated that responsibility to NMFS.

c.     JANET COIT, Assistant Administrator for NOAA Fisheries, is the

highest-ranking official within NMFS and, in that capacity, has direct responsibility

for the administration and implementation of the Magnuson-Stevens Act with

regard to these fisheries, and for compliance with all other federal laws applicable

to the agency. She is sued in her official capacity.

d.     NATIONAL MARINE FISHERIES SERVICE (NMFS) is a federal

agency within NOAA, in the Department of Commerce, with the responsibility of

protecting and managing the fish, marine mammals, and other marine resources of

the United States. NMFS has been delegated authority by the Secretary of

Commerce to implement and enforce the Magnuson-Stevens Act, including

approving fishery management plans and amendments to those plans, and

promulgating implementing regulations. NMFS is the government agency primarily

responsible for ensuring that the requirements of the Magnuson-Stevens Act are

followed and enforced, including the requirements to determine the status of

managed stocks, identify and rebuild overfished fisheries, and set annual catch

limits to end and prevent overfishing.

## LEGAL BACKGROUND

### *The Magnuson-Stevens Fishery Conservation and Management Act*

15.     The Magnuson-Stevens Act was enacted in 1976 to conserve and

manage fish stocks in the United States' exclusive economic zone, which extends

from the boundaries of state waters to 200 miles offshore or to an international

boundary with neighboring countries. *See* 16 U.S.C. § 1801(b)(1); *see also id.*
§ 1856(a)-(b).

16.     To achieve these ends, the Magnuson-Stevens Act establishes a system
for fisheries conservation and management that divides roles and responsibilities
between NMFS and eight regional fishery management councils. *Id.* § 1852(a)(1)(A)-
(H).

17.     The eight regional fishery management councils are comprised of
members that include both state and federal officials as well as appointees
generally selected from fishing and other stakeholder groups. *See id.* § 1852(b), (c).

18.     One of the regional fishery management councils' duties is developing
a fishery management plan ("FMP") and FMP amendments for each fishery within
the regional councils' respective geographic areas of authority, *id.* § 1852(h)(1), and
recommending regulations to implement such plans, *id.* § 1853(c). Once formulated,
FMPs, FMP amendments, and proposed regulations are sent to the Secretary of
Commerce for approval. *See id.* § 1854(a), (b).

19.     The Secretary of Commerce, acting through NMFS, reviews all plans,
plan amendments, and regulations submitted by the regional councils. *Id.* § 1854(a)-
(b). NMFS must "approve, disapprove, or partially approve a plan or amendment"
proposed by a regional council and must evaluate proposed regulations to determine
whether they are consistent with the relevant FMP, the Act, and other applicable
law. *Id.* § 1854(a)(3), (b)(1). Upon approval, NMFS promulgates regulations and
otherwise implements the plans and plan amendments. *Id.* §§ 1854(b)(3), 1855(d).

20.     The Act requires that all FMPs, plan amendments, and implementing regulations be consistent with ten "National Standards" for fishery conservation and management. *Id*. § 1851(a). National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id*. § 1851(a)(1).

21.     Optimum yield in turn is defined by the Act as the amount of fish that, among other factors, "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor . . . ." *Id*. § 1802(33)(B).

22.     The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id*. § 1802(34). Regulatory guidelines promulgated by NMFS further clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass is below a level at which it can produce maximum sustainable yield on a continuing basis. *See* 50 C.F.R. § 600.310(e)(2)(i). The two terms are closely related, as overfishing occurs when the rate of fishing mortality is unsustainable—that is, when more fish are killed than the stock is able to replenish on an ongoing basis—and thus puts the stock in jeopardy of becoming (or remaining) overfished.

23.     National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C.

§ 1851(a)(2). Other National Standards address equity, efficiency, costs, fishing communities, bycatch, and safety of human life at sea. *Id*. § 1851(a)(3)-(10).

24.     The Magnuson-Stevens Act also provides that fishery management plans must contain several specific, required provisions. FMPs must "contain the conservation and management measures . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id*. § 1853(a)(1)(A). FMPs must also "assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery . . . ." *Id*. § 1853(a)(3).

***The 2006 Magnuson-Stevens Reauthorization Act***

25.     Despite the Act's stated central goal of preventing overfishing, overfishing remained chronic in multiple regions across multiple fisheries in the years following 1976. Overfishing challenges continued even after Congress amended the Act in 1996 to impose additional sustainability requirements, such as rebuilding plans for overfished stocks aimed at halting overfishing immediately and reducing fishing mortality to facilitate fishery recovery. *See id*. § 1854(e).

26.     In 2006, Congress amended the Act once again and added a new requirement that would reshape the U.S. fisheries management landscape: mandatory annual catch limits ("ACLs"). Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the

overfishing threshold. The catch limit requirement was intended to finally fulfill the National Standard 1 imperative to prevent overfishing in the Nation's fisheries.

27.     The basic principle behind an annual catch limit is measurable accountability, similar to household budgeting. The regional councils, through consultation with their scientific advisors: determine prior to the start of the fishing year how many fish can be caught to stay below the overfishing threshold; adopt management measures, such as "bag" limits (limits on any individual angler's catch in a single fishing trip), in order to stay within that "budget"; and balance the books at the year's end by subtracting any fishing overages from the next year's catch "budget." This approach represented a radical change in the management of many fisheries, including marine recreational fisheries, that had relied solely on seasonal closures, size limits, and similar measures without direct accountability to an overall catch "budget."

28.     In the years following 2006, overfishing rates across U.S. fisheries dropped significantly under the new catch limits mandate. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F.Supp.3d 254, 266 (D.D.C. 2014) (citations omitted).

29.     The 2006 amendments integrated annual catch limits into the Act's management structure by requiring all FMPs to "establish a mechanism for

specifying annual catch limits in the plan . . . , implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15). Congress also required each regional council to "develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee." *Id.* § 1852(h)(6). Pursuant to NMFS's guidelines, "annual catch limit" is defined as "a limit on the total annual catch of a stock or stock complex . . . that serves as the basis for invoking [accountability measures]." 50 C.F.R. § 600.310(f)(1)(iii).

30.    Congress made its intent clear in the 2006 amendments that annual catch limits should be treated as actual limits—meaning catch caps that are not to be exceeded. *See, e.g.*, 151 CONG. REC. S12840, S12850 (daily ed. Nov. 15, 2005) (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits which shall not be exceeded."); S. REP. NO. 109-229, at 7 (2006) (describing annual catch limit requirement as "scientifically established annual catch limits be[ing] set and adhered to in each managed fishery"); *id.* at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."); *see also* Magnuson-Stevens Act Provisions; Annual Catch Limits; National Standard Guidelines, 74 Fed. Reg. 3178, 3183 (Jan. 16, 2009) ("NMFS decided, that since Congress called for annual catch limits to be set, that the ACL should be considered a true limit—a level not to be exceeded.").

31.     Congress furthermore did not exempt any fisheries or sectors from the ACL mandate. "Catch," as used generally in the Magnuson-Stevens Act and specifically in the ACL requirement, means all fish killed by fishing activity, whether the fishing is recreational or commercial in nature. Pursuant to NMFS's guidelines implementing the National Standards, catch refers to "the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries," noting that "[c]atch includes fish that are retained for any purpose, as well as mortality of fish that are discarded." 50 C.F.R. § 600.310(f)(1)(i).

32.     A regional council may, but is not required to, divide an ACL into sector-ACLs. For this purpose, "sector" means a distinct user group to which separate management strategies and separate catch quotas apply. Examples of sectors include the commercial sector, recreational sector, or various gear groups within a fishery. *Id.* § 600.310(f)(4)(ii). If a Council chooses to use sector-ACLs, the sum of sector-ACLs must not exceed the stock ACL. *Id.*

33.     Accountability measures, as referenced in the Act, *see* 16 U.S.C. § 1853(a)(15) ("measures to ensure accountability"), are defined as "management controls to prevent ACLs, including sector-ACLs, from being exceeded, and to correct or mitigate any overages of the ACL if they occur," 50 C.F.R. § 600.310(g)(1).

### *The 2018 Modernizing Recreational Fisheries Management Act*

34.     Recreational saltwater fishing in the United States has been steadily growing in popularity over the last several decades. In 2020, recreational anglers

harvested an estimated 344 million fish nationwide. NOAA FISHERIES, 2020

FISHERIES OF THE UNITED STATES (2022),

https://www.fisheries.noaa.gov/resource/document/fisheries-united-states-2020. In

many fisheries, particularly in the Mid-Atlantic, Southeast, and Gulf of Mexico

regions, recreational catch equals or exceeds commercial catch and has a clear

conservation impact.

35.    The Mid-Atlantic region has seen significant growth of the recreational

fishing sector. In 2020, recreational fishermen in the region took 49.1 million

fishing trips, catching an estimated 30.6 million summer flounder and 24.5 million

black sea bass. U.S. DEP'T OF COM., FISHERIES ECONOMICS OF THE UNITED STATES

2020 105 (2023).

36.    In recognition of the increased importance of recreational fishing,

Congress passed the Modernizing Recreational Fisheries Management Act of 2018.

*See* Pub. L. No. 115–405, § 102(a)(3), 132 Stat. 5355, 5357 (codified as amended at

16 U.S.C. § 1852(h)(8)). This legislation reaffirmed that recreational fisheries are

not exempt from ACLs, and that ACLs equally apply to recreational and commercial

sectors. Congress noted management options that managers have for recreational

fisheries, including the use of extraction rates or harvest control rules, but

specifically stated that such options are to be used "in addition to" ACLs. *See id.*

37.    Congress further reinforced that "[n]othing in [the Modernizing

Recreational Fisheries Management Act of 2018] shall be construed as modifying

the requirements of . . . []16 U.S.C. 1851(a), 1852(h)(6), 1853(a)(15), and 1854(e)[,]"

which includes the ACL requirement, and noted the "equal application of such requirement[] . . . to commercial, charter, and recreational fisheries, including each component of mixed-use fisheries." *Id.* § 301, 132 Stat. at 5357 (codified as amended at 16 U.S.C. § 1801).

### The Administrative Procedure Act

38.   The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

39.   Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### *The Mid-Atlantic Fishery Management Council's Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan*

40.     The Council is one of the eight regional fishery management councils established by the Magnuson-Stevens Act, whose management authority extends from three to 200 miles off the coasts of New York, New Jersey, Pennsylvania, Delaware, Maryland, and Virginia. 16 U.S.C. § 1852(a)(1)(B).

41.     The Council manages the summer flounder, scup, and black sea bass fisheries cooperatively with the Atlantic States Marine Fisheries Commission ("Commission"), a compact of the 15 Atlantic coastal states that manage marine fish stocks within state waters. This cooperative management arrangement was developed because a significant portion of the catch for all three stocks is taken from both state (0-3 miles offshore) and federal waters (3-200 miles offshore). The Council and Commission work in conjunction with NMFS, which serves as the federal implementation and enforcement entity.

42.     The summer flounder, scup, and black sea bass fisheries span much of the Atlantic coast and each contain a significant recreational and commercial component. Both coastal and inland communities rely on summer founder, scup, and black sea bass for employment, food, and recreational fishing. The recreational fishing seasons for these stocks generally occur from approximately late spring to fall, but season duration varies among the states.

43.     Summer flounder, scup, and black sea bass have each been overfished at different points in their management history. In 1989, the summer flounder stock

had been reduced by overfishing to just 12 percent of its target biomass level. Once a rebuilding plan was fully implemented as required by the Act and catch levels adequately reduced, the summer flounder stock was declared rebuilt in 2010. The scup stock reached an all-time low in 1995 and was not declared rebuilt from an overfished status until 2009. Black sea bass was also declared overfished in 1997 and was not successfully rebuilt until 2009. According to the most recent stock assessments for these three stocks, summer flounder is estimated to be 14% below its target biomass, i.e., the population size that enables the stock to deliver maximum sustainable yield, but not yet formally overfished. Scup and black sea bass stocks are currently more abundant and are above their target biomass.

44.     Summer flounder, scup, and black sea bass are managed under a single FMP. The FMP for summer flounder, scup, and black sea bass contains a detailed framework that the Council and its Scientific and Statistical Committee ("SSC"), the Council's primary scientific advisory body, use to establish ACLs to prevent overfishing of the stocks based on an assessment of the maximum sustainable yield and overfishing threshold for each fishery. *See* 16 U.S.C. §§ 1853(a)(3), (15). The Council prescribed in its FMP that it will use sector-ACLs for the recreational and commercial sectors of each fishery. NMFS approved the Council's Omnibus Amendment 15 containing these measures in 2011. *See* Fisheries of the Northeastern United States; Annual Catch Limits and Accountability Measures, 76 Fed. Reg. 60,606 (Sept. 29, 2011).

45.     The ordinary process for managing the summer flounder, scup, and black sea bass recreational fisheries with ACLs pursuant to the FMP involves two steps. First, the Council consults its SSC to establish a series of related numerical limits—the overfishing limit ("OFL"), acceptable biological catch ("ABC"), ACL, commercial quota, and recreational harvest limit ("RHL")—which are collectively referred to as the "specifications" for that year. The specifications set forth the permissible amount of fish that can be taken in each fishery. The overall ACL is then divided into sector-ACLs for the commercial sector (the commercial ACL) and the recreational sector (the recreational ACL).

46.     The second step occurs after the specifications are established. The Council, in conjunction with the Commission, assembles a bundle of management measures (such as season length, size, and bag limits) for the recreational sector, which are modeled to ensure that recreational fishing remains at or below the RHL, and therefore to ensure that total recreational catch stays below the recreational ACL.

47.     The recreational ACL accounts for total recreational catch, meaning both fish landed and the number of released fish that die ("dead discards"). The RHL specification, as implemented by the Council, accounts only for fish landed and is equal to the recreational ACL minus expected dead discards. The recreational ACL is fully allocated between the RHL and dead discards (i.e., there is no buffer in place), and as such, allowing recreational harvest to exceed the RHL would result in exceeding the recreational ACL based on NMFS's and the Council's own estimates

of dead discards. *See* Mid-Atlantic Fishery Management Council, Recreational

Harvest Control Rule Framework: Environmental Assessment, Regulatory Impact

Review, and Initial Regulatory Flexibility Act Analysis 9-10, 24-25 (Nov. 21, 2022

rev.), https://www.mafmc.org/actions/hcr-framework-addenda.

48.    In January 2023, NMFS approved its suite of harvest specifications for

the 2023 fishing season, including an overall ACL, commercial sector-ACL,

recreational sector-ACL, and RHL for the summer flounder, scup, and black sea

bass fisheries, in accordance with the FMP and sector allocations. NMFS

acknowledged that the specifications, including the OFL, ABC, and sector-ACLs,

represent the appropriate levels of removal for each stock based on the

recommendations of its SSC and are based on the best available science. *See* Final

2023 Summer Flounder, Scup, and Black Sea Bass Specifications, 88 Fed. Reg. 11,

12 (Jan. 3, 2023) (final rule).

***The Framework 17 Approach***

49.    In June 2022, the Council, in conjunction with the Commission,

approved Framework 17 to the summer flounder, scup, and black sea bass FMP,

incorporating what the Council referred to as a "percent change approach" or a

"harvest control rule" for these three fisheries. On March 9, 2023, NMFS issued a

final rule adopting Framework 17 for the 2023 fishing season. Framework

Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass Fishery

Management Plan, and Framework Adjustment 6 to the Bluefish Fishery

Management Plan, 88 Fed. Reg. 14,499 (Mar. 9, 2023) (hereinafter "Framework 17"). The Framework 17 approach will also be utilized in 2024 and 2025.

50.     Framework 17 ignores the mandate of the 2006 amendments to the Magnuson-Stevens Act by separating recreational management decision-making from the ACLs in the summer flounder, scup, and black sea bass fisheries. Rather than assembling a bundle of recreational management measures that are expected to result in a level of catch at or below the recreational catch limit, as described in paragraphs 44 through 46, Framework 17 allows the Council and NMFS to adopt recreational management measures intended to achieve a "harvest target" level that is not the recreational ACL or RHL. This new target will allow recreational catch to exceed both the recreational ACL and total ACL when combined with the commercial ACL.

51.     Framework 17 conflicts with the longstanding process for setting management measures based on ACLs. In this Framework, the Council approved a decision matrix that will be used to identify "harvest targets"—a metric wholly distinct from the recreational ACL and other specifications. Based on the harvest target, the decision matrix directs managers to adjust management measures in a given year, using fixed intervals of 10, 20, and 40 percent. The decision matrix is not based on the existing management approaches in the FMP, including the SSC-recommended specifications as approved by NMFS.

52.     Instead of the recreational ACL, the harvest target is used as the constraining factor for setting recreational management measures. This harvest

target may be above the recreational ACL, sometimes by a significant amount, depending on circumstances in the fishery. Furthermore, Framework 17 contains no other safeguards to constrain recreational catch to the recreational ACL.

53.    Framework 17 additionally contains no safeguard against exceeding the overall ACL for the fisheries. Because the specifications fully allocate the available catch for each stock between the commercial and recreational sectors, NMFS's approval of overages of the recreational sector-ACL pursuant to Framework 17 amounts to approval of an overage for that stock's total ACL, risking exceedances of other specifications (such as ABC and OFL) as well.

54.    These problems are demonstrated in the 2023 Recreational Management Measures wherein NMFS approved recreational management measures for summer flounder, scup, and black sea bass for the 2023 season based on the Framework 17 approach. The 2023 Recreational Management Measures approved "harvest targets" that are (1) above the approved recreational ACL for scup, and (2) above the approved RHL and, accounting for dead discards, would exceed the respective recreational ACLs for black sea bass and summer flounder. *See* Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing Year 2023, 88 Fed. Reg. 55,411 (Aug. 15, 2023) ("2023 Recreational Management Measures")..

55.    In the case of the scup fishery, for example, the application of Framework 17 for 2023 first requires estimating the 2023 harvest under 2022 measures. 88 Fed. Reg. at 55,412 (estimating 2023 harvest under 2022 measures to

be 14.31 million pounds, using Table 1). Next, based on the scup fishery's "very high" stock size category, the decision matrix results in a harvest target of 12.9 million pounds available for recreational harvest to guide the setting of recreational management measures. This is because at the current scup biomass levels, Framework 17 caps any harvest reduction in the next year's recreational catch limit at 10%, even if the previous year's recreational catch exceeded that year's catch limit by more than that, e.g., 20%, 30%, or more. 2023's harvest target will exceed the previously approved recreational ACL for scup by 2.5 million pounds. *See* 88 Fed. Reg. at 12 (Table 1, requiring the recreational ACL to be 10.39 million pounds). Setting recreational harvest to meet the approved RHL and recreational ACL, by contrast, would have required a 35% reduction in harvest. Additionally, when combined with the commercial ACL of 19.29 million pounds, NMFS proposes to allow the 2023 scup fishery to exceed the OFL for the scup fishery by over 2 million pounds. *Id.* (requiring the OFL to be 30.09 million pounds).

56.    NRDC submitted a detailed critical analysis of Framework 17, including how the Framework 17 approach violates the ACL requirements, in a letter to the Council and NMFS during the public comment period. At the request of the Council, the Council's scientific advisors on the SSC published a review of the proposed Framework 17 approach in May 2022. The SSC expressed concern with the Council's representation of this management approach as a "harvest control rule" because of its relationship with the structured process the SSC uses to specify allowable biological catch (ABC) levels or other harvest specifications. *See* Mid-

Atlantic Fishery Management Council, Scientific and Statistical Committee, Implications of Recreational Harvest Control Rules on ABC Specifications, 3-4 (May 19, 2022).

57.     In June 2022, the Mid-Atlantic Council staff formally recommended that the Council should not adopt the Framework 17 approach and should instead develop recreational measures consistent with the ACL framework. Council staff raised concerns that the proposed approach will "reduce the flexibility managers currently have to set measures to prevent overfishing." Memorandum from Julia Beatty, Council Staff, to Chris Moore, Executive Director, Recreational Harvest Control Rule Framework / Addenda Final Action Briefing Materials at 2 (May 27, 2022). Council staff further stated that Framework 17 has no safeguard to ensure that commercial harvest will be below the overall stock ACLs for the three fisheries, and therefore "recreational management measures must aim to prevent recreational ACL overages in order to proactively prevent overfishing and comply with the Magnuson-Stevens [] Act." *Id.*

58.     Despite these concerns, the Council adopted Framework 17 in June 2022.

59.     The function and effect of Framework 17 are to remove the ACL as an actual constraint on management decisions in these recreational fisheries. The Council and NMFS published a final environmental assessment in November 2022, which acknowledged that Framework 17's percent change approach would "allow for some level of RHL overages in some circumstances," which "carry a risk of ACL

overages, which in turn risk ABC and OFL overages and therefore risk resulting in overfishing. Therefore, [Framework 17] cannot be demonstrated to proactively prevent overfishing every year in all circumstances. The RHL accounts for the best available scientific information on stock status. Therefore, even at high biomass levels, RHL overages can result in overfishing." Mid-Atlantic Fishery Management Council, Recreational Harvest Control Rule Framework: Environmental Assessment, Regulatory Impact Review, and Initial Regulatory Flexibility Act Analysis 9 (Nov. 21, 2022), https://www.mafmc.org/actions/hcr-framework-addenda. The environmental assessment further acknowledged that when RHL overages occur, the Framework 17 approach "is expected to have negative impacts on the stock status of summer flounder, scup, [and] black sea bass . . . ." *Id.*

60.     On March 9, 2023, NMFS issued a final rule adopting Framework 17 for the 2023 fishing season. Framework Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan, and Framework Adjustment 6 to the Bluefish Fishery Management Plan, 88 Fed. Reg. 14,499 (Mar. 9, 2023). NMFS stated in the final rule that Framework 17 is consistent with the FMP, despite its effect of taking management out of the ACL framework and specifications process laid out in the FMP. *Id.* at 14,506.

61.     On August 15, 2023, NMFS issued a final rule implementing Framework 17 for the 2023 recreational fishing year. 88 Fed. Reg. at 55,411. NRDC had provided detailed public comment explaining why the 2023 Recreational Management Measures, like the underlying system established in Framework 17,

24

contravened the Magnuson-Stevens Act and the APA. In response, NMFS stated it was not able to deviate from the Framework 17 approach in setting recreational management measures for 2023, because that approach had already been established in a prior action (i.e., Framework 17). *Id.* at 55,414. The agency then defended the Framework 17 approach as a policy matter, *see id.*, and made some unsupported and wholly novel assertions about what overfishing means under the Magnuson-Stevens Act, *id.* at 55,416.

62.    The Council has also announced its intention to apply Framework 17 for future seasons, specifically for the 2024 season for black sea bass, and the 2024 and 2025 seasons for summer flounder and scup. *See* Mid-Atlantic Fishery Management Council (MAFMC); Public Meetings, 88 Fed. Reg. 47,482 (July 24, 2023).

## FIRST CLAIM FOR RELIEF

### NMFS'S APPROVAL OF FRAMEWORK 17 VIOLATED THE MAGNUSON-STEVENS ACT

63.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained the preceding paragraphs.

64.    The Magnuson-Stevens Act requires that fishery management plans "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur" in the relevant fisheries. 16 U.S.C. § 1853(a)(15).

65.    Congress intended annual catch limits to serve as actual limits on catch.

66.     Congress intended ACLs to apply to all sectors and fisheries and to be used prospectively to guide conservation and management.

67.     The Secretary is required to disapprove proposed regulations that are inconsistent with the relevant fishery management plan, National Standards, or other applicable law. *Id.* § 1854(b).

68.     Framework 17 establishes a new management framework that calculates a "harvest target" that is used to determine management measures for recreational fishing in the summer flounder, scup, and black sea bass fisheries.

69.     Under Framework 17, harvest targets are not based on constraining catch to the annual catch limit. The harvest target can exceed the recreational ACL and RHL for the summer flounder, scup, and black sea bass recreational fisheries.

70.     The "harvest target" is not a specification supported by the best available science or consistent with the catch level recommendation of the SSC.

71.     Defendants have admitted that Framework 17 harvest targets can and will exceed relevant specifications.

72.     For the present 2023 recreational fishing season, using NFMS's estimates of dead discards, the recreational harvest targets for scup, summer flounder, and black sea bass exceed the recreational ACLs for these stocks.

73.     Framework 17's use of harvest targets violates the Magnuson-Stevens Act's requirement to set and adhere to annual catch limits to prevent overfishing.

74.     Framework 17's use of harvest targets is in conflict with the ACL mechanism and specifications process laid out in the summer flounder, scup, and

26

black sea bass FMP, and as such, Defendants approved regulations are inconsistent with the relevant FMP.

75.    By approving Framework 17, Defendants violated the Magnuson-Stevens Act.

76.    These actions and failures to act by the Defendants are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

## NMFS'S APPROVAL OF FRAMEWORK 17 VIOLATED THE APA

77.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained the preceding paragraphs.

78.    National Standard 2 of the Magnuson-Stevens Act requires NMFS to base its regulations and actions "upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

79.    Framework 17 establishes a new management framework that calculates a "harvest target" that is used to determine management measures for recreational fishing in the summer flounder, scup, and black sea bass fisheries.

80.    Harvest targets will be based on arbitrarily determined adjustments and caps on reductions of catch levels regardless of overages of the prior year's recreational ACL. The harvest target is not a specification supported by the best available science.

81.    Under Framework 17, harvest targets are not based on constraining catch to the ACL and other relevant specifications. Only the recreational sector will

be managed using the harvest target, and the commercial fishery, by contrast, will continue to be managed with ACLs and using the ACL framework.

82.     Framework 17's use of harvest targets instead of the catch level recommendation and other specifications determined by the SSC is arbitrary and capricious and not in accordance with law.

83.     Framework 17's use of harvest targets is in conflict with the ACL mechanism and specifications process laid out in the summer flounder, scup, and black sea bass FMP.

84.     By approving Framework 17, Defendants acted arbitrarily and capriciously and not in accordance with law, in violation of the APA.

85.     These actions and failures to act by the Defendants are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### NMFS'S APPROVAL OF THE 2023 RECREATIONAL MANAGEMENT MEASURES VIOLATED THE MAGNUSON-STEVENS ACT

86.     Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained the preceding paragraphs.

87.     The Magnuson-Stevens Act requires that fishery management plans "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur" in the relevant fisheries. 16 U.S.C. § 1853(a)(15).

88.     Congress intended annual catch limits to serve as actual limits on catch.

89.    Congress intended ACLs to apply to all sectors and fisheries and to be used prospectively to guide conservation and management.

90.    The Secretary is required to disapprove proposed regulations that are inconsistent with the relevant fishery management plan, National Standards, or other applicable law. *Id.* § 1854(b).

91.    Framework 17 establishes a new management framework that calculates a "harvest target" that is used to determine management measures for recreational fishing in the summer flounder, scup, and black sea bass fisheries.

92.    The 2023 Recreational Management Measures for the 2023 season is based on Framework 17.

93.    The 2023 Recreational Management Measures for the 2023 season set harvest targets that are not based on constraining catch to the annual catch limit.

94.    For the 2023 recreational fishing season, using NFMS's estimates of dead discards, the recreational harvest targets for scup, summer flounder, and black sea bass exceed the recreational ACLs for these stocks.

95.    Because the 2023 Recreational Management Measures suffer from the same legal defects as Framework 17, by approving the 2023 Recreational Management Measures, NMFS violated the Magnuson-Stevens Act.

96.    These actions and failures to act by the Defendants are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

## NMFS'S APPROVAL OF THE 2023 RECREATIONAL MANAGEMENT MEASURES VIOLATED THE APA

97.     Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained the preceding paragraphs.

98.     The Magnuson-Stevens Act requires that fishery management plans "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur" in the relevant fisheries. 16 U.S.C. § 1853(a)(15).

99.     Congress intended annual catch limits to serve as actual limits on catch.

100.     Congress intended ACLs to apply to all sectors and fisheries and to be used prospectively to guide conservation and management.

101.     The Secretary is required to disapprove proposed regulations that are inconsistent with the relevant fishery management plan, National Standards, or other applicable law. *Id.* § 1854(b).

102.     Framework 17 establishes a new management framework that calculates a "harvest target" that is used to determine management measures for recreational fishing in the summer flounder, scup, and black sea bass fisheries.

103.     The 2023 Recreational Management Measures are based on Framework 17.

104.     The 2023 Recreational Management Measures set harvest targets that are not based on constraining catch to the annual catch limit.

105.    By approving the 2023 Recreational Management Measures for the 2023 season, NMFS violated the Magnuson-Stevens Act.

106.    Harvest targets are based on arbitrarily determined adjustments and caps on reductions of catch levels regardless of overages of the prior year's recreational ACL.

107.    The harvest targets are not based on constraining catch to the ACL and other relevant specifications. Only the recreational sector will be managed using the harvest target, and the commercial fishery, by contrast, will continue to be managed with ACLs and using the ACL framework.

108.    The use of harvest targets to set the 2023 Recreational Management Measures instead of the catch level recommendation and other specifications determined by the SSC is arbitrary and capricious and not in accordance with law.

109.    The 2023 Recreational Management Measures' use of Framework 17's harvest targets is in conflict with the ACL mechanism and specifications process laid out in the summer flounder, scup, and black sea bass FMP.

110.    Because the 2023 Recreational Management Measures suffer from the same legal defects as Framework 17, by approving the 2023 Recreational Management Measures, Defendants acted arbitrarily and capriciously and not in accordance with law, in violation of the APA.

111.    These actions and failures to act by the Defendants are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Declare that Defendants violated the Magnuson-Stevens Act and the
        APA when they approved Framework 17;

2.      Declare that Defendants violated the Magnuson-Stevens Act and the
        APA when they approved the 2023 Recreational Management
        Measures;

3.      Vacate and set aside the final rule approving Framework 17;

4.      Vacate and set aside the 2023 Recreational Management Measures
        and, as applicable, any subsequent years' implementing rules based on
        Framework 17;

5.      Maintain jurisdiction over this action until Defendants are in
        compliance with the Magnuson-Stevens Act and the APA, and every
        order of this Court; and

6.      Provide Plaintiff such additional and further relief as may be
        appropriate.

DATED: August 28, 2023

                      Respectfully submitted,

                      /s/ *Kimberly E. Leefatt*
                      Kimberly E. Leefatt (Bar ID NY0539)
                      Natural Resources Defense Council
                      1314 2nd Street
                      Santa Monica, California 90401
                      (310) 434-2357
                      kleefatt@nrdc.org

Katherine Desormeau (Bar ID CA00024)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
(415) 875-6158
kdesormeau@nrdc.org


Molly Masterton (*admitted pro hac vice*)
Natural Resources Defense Council
40 West 20th Street
New York, New York 10011
(212) 727-4451
mmasterton@nrdc.org

*Counsel for Plaintiff Natural Resources Defense
Council*