# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GINA M. RAIMONDO, in her official capacity as Secretary of the Department of Commerce *et al.*,<br><br>Defendants,<br><br>and<br><br>AMERICAN SPORTFISHING ASSOCIATION,<br><br>Defendant-Intervenor. | Civil Action No. 23-982 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, establishes "[a] national program for the conservation and management of the fishery resources of the United States," *id.* § 1801(a)(6), and is administered by the National Marine Fisheries Service ("NMFS"), with help from eight regional fishery management councils. To regulate American fisheries, NMFS and councils prepare and implement fishery management plans ("FMPs") that will "achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* § 1801(b)(4). FMPs must conform to the "national standards for fishery conservation and management" ("National Standards"), *id.* § 1851(a), and must contain certain provisions, including, as relevant here, "a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level

such that overfishing does not occur in the fishery, including measures to ensure accountability," *id.* § 1853(a)(15).

This case concerns Framework 17, which, in relevant part, modified the process of determining whether recreational management measures, such as season length, minimum fish size, and bag limits, need to be adjusted for a given year, by adopting the recreational harvest control rule ("HCR") for the Mid-Atlantic Fishery Management Council's (the "Mid-Atlantic Council") Summer Flounder, Scup, and Black Sea Bass FMP. *See* Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Framework Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan, and Framework Adjustment 6 to the Bluefish Fishery Management Plan ("Framework 17 Final Rule"), 88 Fed. Reg. 14,499, 14,499 (Mar. 9, 2023).[1]  Plaintiff Natural Resources Defense Council, Inc. brought this action against defendant Gina M. Raimondo, in her official capacity as Secretary of the Department of Commerce; Janet Coit, in her official capacity as Assistant Administrator for NOAA Fisheries; the National Oceanic and Atmospheric Administration; and NMFS, arguing that Framework 17 violates the MSA and Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  *See generally* Compl., ECF No. 1.  The American Sportfishing Association, which represents recreational anglers, was granted permission to intervene.  *See* Min. Order (July 27, 2023).

During the pendency of this action, the 2023, 2024, and 2025 recreational management measures were finalized.  *See* Fisheries of the Northeastern United States; Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing

---

[1]        The final rule is comprised of Framework Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass FMP, as well as Framework Adjustment 6 to the Bluefish FMP, but the latter component is not at issue in this action.

Year 2023 ("2023 Recreational Management Measures Final Rule"), 88 Fed. Reg. 55,411 (Aug. 15, 2023); Fisheries of the Northeastern United States; 2024 and 2025 Summer Flounder and Scup, and 2024 Black Sea Bass Recreational Management Measures ("2024–2025 Recreational Management Measures Final Rule"), 89 Fed. Reg. 32,374 (Apr. 26, 2024).  Promulgation of these management measures prompted plaintiff twice to amend the complaint to add claims that use of Framework 17's HCR to generate the 2023, 2024, and 2025 recreational management measures violated the MSA and APA.  *See* Am. Compl., ECF No. 22; 2d Am. Compl., ECF No. 38.  Plaintiff seeks vacatur of Framework 17, and the 2023, 2024, and 2025 recreational management measures.

Now pending before the Court are two sets of cross-motions for summary judgment.[2] The first set concerns claims that Framework 17 and its use to set the 2023 recreational management measures violate the MSA and APA.  *See* Pl.'s Mot. for Summ. J., ECF No. 25; Pl.'s Mem. Supp. Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 25-1; Int.'s Opp'n Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J., ECF No. 27; Int.'s Mem. Supp. Opp'n Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J. ("Int.'s Opp'n"), ECF No. 27-1; Defs.' Opp'n Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J., ECF No. 30; Defs.' Mem. Supp. Opp'n Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J. ("Defs.' Opp'n"), ECF No. 30-1; Pl.'s Reply Supp. Mot. Summ. J. & Opp'n Defs.' & Int.'s Cross-Mots. Summ. J. ("Pl.'s Reply"), ECF No. 31; Int.'s Reply Supp. Cross-Mot. Summ. J. ("Int.'s Reply"), ECF No. 33; Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 34.  The second set considers whether claims regarding the 2023 recreational management measures are moot now that the 2023 fishing season is over, as well as the claims that use of the HCR to set the 2024 and 2025 recreational management measures violate the MSA and APA.

---

[2]      Since most of the briefing is docketed twice, only one of the duplicate memoranda is referenced to simplify citation.

*See* Pl.'s Suppl. Mot. for Summ. J., ECF No. 42; Pl.'s Mem. Supp. Suppl. Mot. for Summ. J.

("Pl.'s Suppl. Mem."), ECF No. 42-1; Int.'s Opp'n Pl.'s Suppl. Mot. Summ. J. & Suppl. Cross-

Mot. Summ. J., ECF No. 43; Int.'s Mem. Supp. Opp'n Pl.'s Suppl. Mot. Summ. J. & Suppl.

Cross-Mot. Summ. J. ("Int.'s Suppl. Opp'n"), ECF No. 43-1; Defs.' Opp'n Pl.'s Suppl. Mot.

Summ. J. & Suppl. Cross-Mot. Summ. J., ECF No. 46; Defs.' Mem. Supp. Opp'n Pl.'s Suppl.

Mot. Summ. J. & Suppl. Cross-Mot. Summ. J. ("Defs.' Suppl. Opp'n"), ECF No. 46-1; Pl.'s

Reply Supp. Suppl. Mot. Summ. J. & Opp'n Defs.' & Int.'s Suppl. Cross-Mots. Summ. J. ("Pl.'s

Suppl. Reply"), ECF No. 48; Defs.' Reply Supp. Suppl. Cross-Mot. Summ. J. ("Defs.' Suppl.

Reply"), ECF No. 49.

For the reasons set forth below, defendants' cross-motions for summary judgment are

GRANTED, plaintiff's motions for summary judgment are DENIED, and intervenor's cross-

motions for summary judgment are DENIED AS MOOT.

## I.     BACKGROUND

The relevant statutory and regulatory framework, as well as the facts from which this

litigation arises, are presented below.  At the outset, the alphabet soup of acronyms used in this

litigation facilitates expeditious description but also may be confusing, and thus reminders of

what the acronyms mean are repeated in different sections to help the reader.

### A.     The Magnuson-Stevens Fishery Conservation and Management Act

Enacted in 1976, the MSA establishes "[a] national program for the conservation and

management of the fishery resources of the United States," 16 U.S.C. § 1801(a)(6), granting the

federal government "exclusive fishery management authority over all fish" within the "exclusive

economic zone," *id.* § 1811(a), "an area extending 200 nautical miles seaward from each state's

coastline," *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir. 2016); *see*

*also* 16 U.S.C. § 1802(11); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2254 (2024).[3]
The purposes of the MSA include "to conserve and manage the fishery resources . . . of the
United States" and "to promote domestic commercial and recreational fishing under sound
conservation and management principles." 16 U.S.C. § 1801(b)(1), (b)(3).

NMFS, acting under authority delegated from the Secretary of Commerce, administers
the MSA, with help from regional fishery management councils. *See Loper Bright Enters.*, 144
S. Ct. at 2254; *A.P. Bell Fish Co. v. Raimondo*, 94 F.4th 60, 62 (D.C. Cir. 2024); *see also* 16
U.S.C. § 1801(b)(5) (declaring that a purpose of the MSA is "to establish Regional Fishery
Management Councils to exercise sound judgment in the stewardship of fishery resources"); *id.*
§ 1852(a) (establishing the eight regional fishery management councils). Each council has
authority over a specific geographic region within the exclusive economic zone and is comprised
of "members who represent the interests of the states included in that region," *C & W Fish Co. v.
Fox*, 931 F.2d 1556, 1557–58 (D.C. Cir. 1991), such as representatives from the coastal states,
the commercial, recreational, and charter fishing sectors, and NMFS, *see* 16 U.S.C. § 1852(b);
*see also N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). To assist in "the
development, collection, evaluation, and peer review" of any "scientific information" relevant to
its activity, and to provide "ongoing scientific advice for fishery management decisions," each
council is required to establish a scientific and statistical committee ("SSC"), comprised of
members with "strong scientific or technical credentials and expertise." 16 U.S.C. § 1852(g)(1).

---

[3]     "Within each coastal State's territorial sea, which generally extends three geographic miles from its
coastline, the State has jurisdiction to regulate fishing." *Oceana, Inc. v. Raimondo*, 35 F.4th 904, 906 (D.C. Cir.
2022).

1.    *Fishery Management Plans*

The primary tool for the regulation of fisheries is the creation and implementation of fishery management plans, or FMPs.  Each council is tasked with preparing and submitting, for fisheries under their authority, FMPs that will "achieve and maintain, on a continuing basis, the optimum yield [("OY")] from each fishery."  *Id.* § 1801(b)(4); *see also id.* § 1852(h)(1) (providing that councils "shall" submit FMPs); *id.* § 1801(b)(5) (declaring that a purpose of the MSA is to establish councils who "steward[] . . . fishery resources through the preparation, monitoring, and revision" of FMPs).  Under the MSA, FMPs must include certain provisions, such as "the conservation and management measures" "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery"; an assessment of "the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery"; and "objective and measurable criteria for identifying when the fishery to which the plan applies is overfished."  *Id.* § 1853(a).[4]

FMPs must also conform to the National Standards.  *See id.* § 1853(a)(1)(C); *see also id.* § 1851(a) (listing the National Standards); *id.* § 1801(b)(4) (describing one of the MSA's purposes as "to provide for the preparation and implementation, in accordance with national standards, of fishery management plans").  Relevant to this dispute, National Standard 1 ("NS1") provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States

---

[4]    Optimum yield is defined as "the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery."  16 U.S.C. § 1802(33).

fishing industry."  *Id.* § 1851(a)(1).[5]  National Standard 2 ("NS2") requires that any conservation

and management measures be "based upon the best scientific information available."  *Id.*

§ 1851(a)(2).  Advisory guidelines for the National Standards are set forth at 50 C.F.R.

§§ 600.305–600.355, which guidelines do "not have the force and effect of law" but may be used

"to assist in the development of fishery management plans."  16 U.S.C. § 1851(b).

      Emblematic of NMFS and councils' shared responsibility for administering the MSA is

that councils are tasked with preparing, submitting, and eventually implementing FMPs, while

NMFS has approval authority over FMPs.  *See id.* § 1854(a) (setting out the Secretary of

Commerce's authority over FMPs); *see also A.P. Bell Fish Co.*, 94 F.4th at 62 ("The [MSA]

authorizes the Secretary of Commerce to delegate to [NMFS] the authority to implement

proposed fishery management plans and their amendments.").  Specifically, upon receipt of an

FMP, NMFS "immediately commence[s] a review of the [FMP] . . . to determine whether it is

consistent with the national standards, the [MSA], and any other applicable law," and publishes,

in the Federal Register, notice of the FMP for 60 days of public comment.  16 U.S.C.

§ 1854(a)(1).  Within 30 days of the close of the comment period and after "tak[ing] into

account," *inter alia*, "the information, views, and comments received from interested persons,"

*id.* § 1854(a)(2)(A), NMFS is required to decide whether to "approve, disapprove, or partially

approve" the FMP, *id.* § 1854(a)(3).  If the FMP is not approved or only partially approved,

NMFS must specify "the applicable law with which the [FMP] is inconsistent," "the nature of

---

[5]      Overfishing is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(34).  Preventing overfishing is so critical that this goal is expressly reiterated in Section 1853(a), which lists an FMP's required provisions to include "the conservation and management measures . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery," *see id.* § 1853(a)(1)(A), even though Section 1853(a) already incorporates, by reference, the National Standards, *see id.* § 1853(a)(1)(C) ("Any fishery management plan . . . shall . . . contain the conservation and management measures . . . , which are . . . consistent with the national standards.").

such inconsistencies," and "recommendations concerning the actions that could be taken by the [c]ouncil to conform such plan . . . to the requirements of applicable law." *Id.* § 1854(a)(3). If, however, an FMP is approved, NMFS publishes a final rule and one or more implementing regulations in the Federal Register. *See id.* § 1854(a)(3), (b)(1), (b)(3); *see also N.C. Fisheries Ass'n*, 550 F.3d at 17 (explaining that implementing regulations are necessary because FMPs "do not themselves have any regulatory effect"). Approved FMPs are subject to judicial review for 30 days under the MSA. *See* 16 U.S.C. § 1855(f)(1).

Recognizing that FMPs may sometimes require modification to keep up to date, NMFS and councils are also tasked with enacting amendments and framework adjustments. Amendments alter FMPs in broad strokes and are subject to the same requirements as FMPs, with the additional requirement that any amendment must be consistent with the underlying FMP, as well as the same notice and comment process as FMPs. Framework adjustments, in contrast, modify or update FMPs in more modest ways, through an abbreviated administrative procedure rather than the full amendment process, thereby allowing NMFS and councils to respond more quickly and efficiently to new developments. *See id.* §§ 1853(c), 1854(b); *see also* 50 C.F.R. § 648.110(a)(1) ("Issues that require significant departures from previously contemplated measures or that are otherwise introducing new concepts may require an amendment of the FMP instead of a framework adjustment.").[6]

---

[6] For the Summer Flounder, Scup, and Black Sea Bass FMP, framework adjustments, which are promulgated if "necessary to meet or be consistent with the goals and objections of the FMP," can be made with respect to only specifically delineated categories of information. 50 C.F.R. § 648.110(a). The public must be given notice of the adjustments, which are then considered over the span of at least two council meetings. *Id.* § 648.110(a)(1). Framework adjustments are presented as recommendations to NMFS and, if NMFS concurs, a final rule is issued in the Federal Register. *Id.* § 648.110(a)(2)–(3).

### 2.    *Annual Catch Limits and Accountability Measures*

Enacted in 2007, the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007), reauthorized and amended the MSA, and, as relevant here, "fundamentally altered American fishing regulation," by requiring regional fishing council to establish, for each fishery within its jurisdiction, annual catch limits ("ACLs"), *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014).  As amended, the MSA requires FMPs to "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery," as well as accountability measures ("AMs") to ensure compliance with ACLs.  16 U.S.C. § 1853(a)(15). Each council establishes ACLs, subject to NMFS approval.  To do so, a council must consult with its SSC, which issues "recommendations for acceptable biological catch, preventing overfishing, maximum sustainable yield [("MSY")], and achieving rebuilding targets" for each fishery within a council's jurisdiction, *id.* § 1852(g)(1)(B), based on the best available science, *id.* § 1851(a)(2).  Any ACL established by a council "may not exceed the fishing level recommendations" of its SSC.  *Id.* § 1852(h)(6).  Notably, the MSA did not define ACL or AM. *See generally id.* § 1802.

In response to these amendments, NMFS revised its advisory guidelines for NS1—which, recall, provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," *id.* § 1851(a)(1)—"to provide guidance on how to comply with" the new ACL and AM requirements, and to "clarif[y] the relationship between ACLs, acceptable biological catch (ABC), maximum sustainable yield (MSY), optimum yield (OY), and other applicable reference points," Magnuson-Stevens Act Provisions; Annual Catch Limits; National Standard

Guidelines, 74 Fed. Reg. 3178, 3178 (Jan. 16, 2009); *see also* 50 C.F.R. § 600.310(b)(1).  As amended, the NS1 Guidelines set forth a multi-step process intended to generate various limits on catch, including ACLs.  Only a simplified overview of this complicated process is necessary for purposes of the instant action.

First, the council establishes, for a particular stock, an "overfishing limit" ("OFL"), *i.e.*, an estimate of the largest amount of catch, by number or weight of fish, in a year, above which overfishing would occur.  *See* 50 C.F.R. § 600.310(e)(2)(i)(C)–(D) (explaining that the OFL is set by applying the maximum fishing mortality threshold, *i.e.*, the annual rate of fishing mortality above which overfishing will occur, to the stock's total size).

Second, the council determines an "acceptable biological catch" ("ABC"), *i.e.*, a reduced OFL, having accounted for any "scientific uncertainty" and "the [c]ouncil's risk policy."  *Id.* § 600.310(f)(1)(ii).  The purpose of the buffer between the OFL and ABC is to reduce the risk that the OFL will be exceeded.  *See id.* § 600.310(f)(4).

Third and finally, the council sets the ACL, *i.e.*, "a limit on the total annual catch of a stock . . . that serves as the basis for invoking AMs."  *Id.* § 600.310(f)(1)(iii).  The ACL "cannot exceed the ABC," *id.*, and should account for "management uncertainty," *i.e.*, "the uncertainty in quantifying the true catch amounts," such as late reporting, misreporting, and underreporting, *id.* § 600.310(f)(1)(v), (f)(4)(i).

In sum, based on the recommendations of its SSC, the council must establish, for a particular stock, the OFL, ABC, and ACL.  The ACL must be less than or equal to the ABC to account for management uncertainty, and the ABC must be less than or equal to the OFL to account for scientific uncertainty.

The NS1 Guidelines provide the only definition of ACLs: "a limit on the total annual catch of a stock or stock complex . . . that serves as the basis for invoking AMs." *Id.* § 600.310(f)(1)(iii). AMs are, in turn, defined as "management controls to prevent ACLs, including sector-ACLs, from being exceeded, and to correct or mitigate overages of the ACL if they occur." *Id.* § 600.310(g)(1). "AMs should address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage in as short a time as possible." *Id.* They fall into two categories: (1) inseason AMs, such as closure of a fishery, and changes to trip size or bag limits; and (2) AMs for when the ACL is exceeded, such as overage adjustments or modifications of inseason AMs or ACTs. *Id.* § 600.310(g)(1)–(3). "If catch exceeds the ACL for a given stock or stock complex more than once in the last four years, the system of ACLs and AMs should be reevaluated, and modified if necessary, to improve its performance and effectiveness." *Id.* § 600.310(g)(7).

### B.    The Summer Flounder, Scup, and Black Sea Bass FMP

This action concerns summer flounder, scup, and black sea bass, three fish species that have previously been overfished, and, as a result, their stock has had to be rebuilt. *See* AR 2501 (describing scup and black sea bass as "rebuilt stocks"); AR 2618 (same for summer flounder). Today, fortunately, both scup and black sea bass have very high stock, with their stock doubling their target, and are at little risk of overfishing. *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,503. When this action was initiated, summer flounder, too, was not overfished, though its stock was low and decreasing. Although both the commercial and recreational summer flounder harvests were below their respective ACLs for the 2021 and 2022 seasons, *see* AR 3941–42, on November 6, 2023, while this action was pending, summer flounder was designated overfished, based on data from the 2022 season, *see* Determination of Overfishing or an Overfished Condition, 88 Fed. Reg. 76,188, 76,188 (Nov. 6, 2023).

The Mid-Atlantic Council, which has jurisdiction over fisheries in federal waters off the coasts of New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina, *see* 16 U.S.C. § 1852(a)(1)(B), manages, with NMFS, summer flounder, scup, and black sea bass under a single FMP due to the similarities between these fisheries.[7]  All three types of fish are targeted for both commercial fishing, *i.e.*, "fishing in which the fish harvested, either in whole or in part, are intended to enter commerce or enter commerce through sale, barter or trade," *id.* § 1802(4), and recreational fishing, *i.e.*, "fishing for sport or pleasure," *id.* § 1802(37).  "While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities."  *Id.* § 1801(a)(13).  The MSA thus counsels that "science-based conservation and management approaches should be adapted to the characteristics of each sector."  *Id.*[8]

Heeding this instruction, NMFS has developed different methods for monitoring and gathering information about the harvest activities of the recreational and commercial sectors. For the commercial sector, dealers are required to submit mandatory weekly reports detailing "all fish purchased or received for a commercial purpose," 50 C.F.R. § 648.7(a)(1), (f)(1), and vessel owners and operators are required to submit, "within 48 hours at the conclusion of a trip," mandatory trip reports providing "an accurate fishing log report for each fishing trip," *id.* § 648.7(b)(1), (f)(2).  With these regular reports, NMFS can accurately track and assess

---

[7]     Since summer flounder, scup, and sea bass are present in and move between federal and state waters, NMFS and Mid-Atlantic Council also coordinate with the Atlantic States Marine Fisheries Commission, an interstate compact of the fifteen Atlantic coastal states that manage marine fish stock within state waters.  *See* 16 U.S.C. §§ 5101(a)(1), 5102(3).  The role of the Atlantic State Marine Fisheries Commission is not at issue here.

[8]     Indeed, the 2018 Modernizing Recreational Fisheries Management Act, Pub. L. No. 115-405, 132 Stat. 5355 (2018), enacted in recognition of the management challenges that recreational fisheries were facing, expressly granted councils the "authority to use fishery management measures in recreational fishery . . . in developing a fishery management plan, plan amendment, or proposed regulations, such as extraction rates, fishing mortality targets, harvest control rules, or traditional or cultural practices of native communities," 16 U.S.C. § 1852(h)(8), in addition to their existing duty to "develop annual catch limits for each of its managed fisheries," *id.* § 1852(h)(6).

commercial harvest with few, if any, additional tools.  If the total reported commercial catch reaches the commercial ACL before the season is over, the solution is simple: NMFS can, with notice, close the commercial fishery.

Tracking recreational fishing, in contrast, is significantly more difficult, given the large number of participants and access points and lack of mandatory catch reporting.  *See* AR 3617. Rather than attempting to account for every fish caught in real time or even weekly, NMFS conducts angler surveys through the Marine Recreational Information Program ("MRIP").  *See* 16 U.S.C. § 1881(g).  The MRIP survey intercepts a random small subset of recreational anglers, determines the number of fish they have caught and the amount of fishing effort, then uses this limited data to extrapolate to annual estimates of total recreational catch.  Unsurprisingly, this survey-based system has limitations.  Survey sampling, for example, "covers only a small proportion of anglers and relies on recall as well as direct observation of catches after the actual catch has occurred, which tends to result in catch data that are more uncertain, more sensitive to details of survey design, and less timely relative to the data collected for commercial fisheries." AR 3617.

### C.     The Omnibus Amendment

In 2011, the Mid-Atlantic Council developed, in consultation with NMFS, the Omnibus Amendment, which amended all six of its FMPs, including the Summer Flounder, Scup, and Black Sea Bass FMP, to address the new requirements set out by the 2007 MSA amendments and the accompanying revised NS1 Guidelines.  *See generally* Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Annual Catch Limits and Accountability Measures ("Omnibus Amendment"), 76 Fed. Reg. 60,606 (Sept. 29, 2011); *see also supra* Section I.A.2 (describing the relevant amendments to the

MSA and NS1 Guidelines).[9]  In relevant part, the Omnibus Amendment "establishe[d] the framework that the Council and SSC will utilize to establish catch limits" and "the system for maintaining accountability when ACLs are exceeded."  Omnibus Amendment, 76 Fed. Reg. at 60,606.

The Omnibus Amendment contemplates the setting of commercial and recreational catch and landing limits annually, through a process referred to as "specifications."  The most relevant aspects of the specifications process ("Specifications Framework") are summarized below.

The Omnibus Amendment instructs that the "overfishing limit" (or OFL), should first be established, then reduced to account for scientific uncertainty to arrive at the "acceptable biological catch" (or ABC).[10]  *See id.* at 60,607.  The "annual catch limit" (or ACL) is then set equal to the ABC.  *See id.*  For some stock, such as summer flounder, scup, and black sea bass, the ACL is further apportioned to sector-ACLs, *i.e.*, separate catch limits for the commercial and recreational sectors, with the proviso that "[t]he sum of these sector ACLs will equal the ABC." *Id.*

Each sector's ACL is further divided into dead discards, *i.e.*, fish that are caught and thrown overboard, and landings, *i.e.*, fish that are caught and brought to land.[11]  *See id.*  The limit

---

[9]  The Omnibus Amendment acted as Amendment 15 to the Summer Flounder, Scup, and Black Sea Bass FMP.  *See* Omnibus Amendment, 76 Fed. Reg. at 60,606.

[10]  The Omnibus Amendment sets out the specific method for computing the necessary reduction, which method is not at issue in this dispute.

[11]  Sector ACLs are sometimes reduced to account for management uncertainty, resulting in a value called the annual catch target ("ACT").  Omnibus Amendment, 76 Fed. Reg. at 60,607; *see also id.* at 60,610 ("The purpose of utilizing an ACT is so that, given uncertainty in the amount of catch that will result from the conservation and management measures, the ACL will not be exceeded.").  For the 2023, 2024, and 2025 fishing seasons, the ACT has been set at the ACL for summer flounder, scup, and black sea bass.  *See* Fisheries of the Northern United States; Final 2023 Summer Flounder, Scup, and Black Sea Bass Specifications, 88 Fed. Reg. 11, 12 (Jan. 3, 2023); Fisheries of the Northeastern United States; 2024 and Projected 2025 Specifications for the Summer Flounder and Scup Fisheries, and 2024 Specifications for the Black Sea Bass Fishery, 88 Fed. Reg. 88,266, 88,266–67 (Dec. 21, 2023).

on commercial landings is called the "commercial quota," and the limit on recreational landings is called the "recreational harvest limit" ("RHL"), with each representing the total amount of fish that the commercial and recreational sectors are permitted to bring ashore.  In sum, under the Omnibus Amendment, the formulaic structure for all of the Mid-Atlantic Council's FMPs was as follows: OFL ≥ ABC = ACL(s), with scientific uncertainty addressed by reducing the OFL to obtain the ABC.  *Id.*

Every year, the Mid-Atlantic Council uses the Specifications Framework to establish, for NMFS approval, recommendations for a specific stock's OFL, ABC, and ACLs.  It then develops, again subject to NMFS approval, season-specific management measures to govern specific aspects of a fishery's operation.

### D.    Recreational Management Measures

The MSA requires FMPs to establish not only a mechanism for specifying the ACL, but also a suite of accountability measures (or AMs).  *See* 16 U.S.C. § 1853(a)(15).  For the summer flounder, scup, and black sea bass fisheries, the Mid-Atlantic Council develops AMs that are responsive to exceeding the ACL, but not inseason AMs due to the lag time in the collection and analysis of recreational survey data.  *See* 50 C.F.R. §§ 648.103, 648.123, 648.143 (summer flounder, scup, black sea bass AMs).  The AM relevant to this dispute is the adjustment of season-specific recreational management measures.  Examples of recreational management measures include season length, minimum fish size, and bag limits on the maximum number of fish an angler is permitted to keep.

Prior to Framework 17, at issue here, these recreational management measures were calibrated to target an estimated recreational harvest at or below the RHL (the "status quo approach" to setting management measures).  Although the development of the RHL includes some consideration of scientific uncertainty (when the OFL is reduced to the ABC) and stock

size (when calculating the OFL), such consideration, which treated the recreational and commercial sectors identically, was deemed untenable for the recreational sector.

First, as discussed above, recreational fishing data, collected via MRIP surveys, proved to be highly variable and uncertain in any given year.  As a result, accurate stock measures were difficult to obtain.  In fact, "[w]hen a stock assessment is rerun and updated, it is often the case that [the] perception of the stock size has changed."  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,502.  Black sea bass, for example, "recently experienced a retrospective pattern that . . . revealed that stock assessments have routinely underestimated stock size and overestimated fishing mortality, resulting in the stock size subsequently being higher than originally estimated, and fishing mortality lower, when a new/updated assessment is conducted."  *Id.*  Such "pattern" leads to "catch limits that are set lower than what is actually available to the fishery and years where even restrictive management measures result in higher than anticipated harvest, often with increasing levels of discards, even without overfishing occurring."  *Id.*

Correct and consistent estimations of recreational harvest were also difficult to obtain. From 2018 to 2021, the recreational harvest for summer flounder, scup, and black sea bass, as estimated using MRIP surveys, varied by as much as 45 percent from year to year, despite no change in recreational management measures.  *See id.* at 14,501.  The estimated black sea bass recreational harvest alone ranged from 10.20 million pounds to 16.17 million pounds, during this three-year period.  *Id.*

By setting management measures to produce an estimated harvest that was equal to or below the RHL, the status quo approach "chased" the RHL.  Since the RHL can fluctuate significantly from year-to-year due to methodological problems unrelated to the availability of stock and is based on stock size estimates that are uncertain, management measures, "[r]eacting

to these large, uncertain swings, in estimated harvest," could also fluctuate significantly from year-to-year, with no guarantee that the actual recreational harvest would be close to the RHL. *Id.* (explaining that the status quo approach "has been unsuccessful by all standards"). In developing a new approach, NMFS sought to reduce this uncertainty and smooth out this instability.

Second, the status quo approach did not factor in biomass, *i.e.*, "[t]he size of a stock of fish measured in weight," *id.* at 14,500, in its determination of the degree by which management measures can change from year-to-year. In other words, management measures were changed with no regard to whether a stock was low or in abundance. For very high stock, the status quo approach could result in needlessly restrictive management measures. *See id.* at 14,502 ("[W]hat appear to be overages often have no negative impact on abundant stocks as we continue to see increases in biomass through a subsequent stock assessment."); *id.* at 14,503 (explaining that when a stock's biomass is higher than the biomass target, it is "larger than is ideal for maximizing long-term benefits"). Black sea bass, for example, has more than double its target stock, despite repeated findings that the expected recreational harvest for this species exceeds the RHL, resulting in fairly restrictive management measures. *See id.* at 14,503. Under the status quo approach, management measures would continue to be restricted in an effort, every year, to close the entire gap between the expected recreational harvest and the RHL, despite black sea bass's high abundance. This approach has led to much frustration among recreational anglers and related businesses, difficulties in managing recreational fisheries with an eye towards balancing the need to avoid overfishing and to achieve OY, as required by the MSA, and the unintended consequence of increased recreational dead discards, given that, due to their

17

abundance, black sea bass would be difficult to avoid despite restrictive bag and size limits.  *See id.* at 14,501–02, 14,504.

In contrast, for very low stock, the status quo approach offers no guardrails to limit liberalization of management measures.  Summer flounder, for example, is at low and decreasing stock size.  *See id.* at 14,502.  Imagine a situation where the RHL is calculated based on an overestimation of the availability of summer flounder, or the recreational catch appears to fall due to poor data.  Under the status quo approach, management measures could be liberalized, with no restriction and without regard of summer flounder's decreasing stock, to "chase" the RHL.  *See id.* at 14,503.

E.      Framework 17

Frustrated with the status quo approach, the Mid-Atlantic Council initiated, in 2021, a framework adjustment to modify the process of setting recreational management measures.  Its goal was "to establish a process for setting recreational measures that: [p]revent overfishing; are reflective of stock status; appropriately account for uncertainty in the recreational data; take into consideration angler preferences; and provide an appropriate level of stability and predictability in changes from year to year."  Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Framework Adjustment 17 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan, and Framework Adjustment 6 to the Bluefish Fishery Management Plan ("Framework 17 Proposed Rule"), 87 Fed. Reg. 76,600, 76,601 (Dec. 15, 2022).

In 2023, NMFS published a final rule implementing the recreational harvest control rule (or HCR), which adopted a process called the "percent change approach."  *See* Framework 17

Final Rule, 88 Fed. Reg. at 14,499.[12]  The HCR was expected to be "an improvement over the status quo process because it allows for management measures to be set for 2 years," rather than one, "includes the explicit consideration of the best estimate of the current biomass of the stock compared to the target level, and requires the consideration of the variability of harvest estimates."  *Id.* at 14,500.  The approach, however, was enacted as "an interim process" that "will sunset no later than December 31, 2025," with "additional improvements to recreational fisheries management," developed through separate actions, expected "by fishing year 2026."  *Id.*  If no such action is taken by the sunset date, "the process for establishing recreational measures will revert to the methodology previously used by the Council."  *Id.*

The HCR does not deviate considerably from the status quo approach.  Indeed, Framework 17 made no changes to the Specifications Framework that establishes the OFL, ABC, and ACLs.  The HCR simply adds consideration of a new value, calculated independently of the Specifications Framework, called the "recreational harvest target" ("RHT").  Whereas, under the status quo approach, recreational management measures were calibrated to result in an estimated recreational harvest at or below the "recreational harvest limit" (or RHL), the HCR sets management measures to target an estimated recreational harvest at or below the "recreational harvest target" (or RHT).

### 1.    *The Harvest Control Rule*

The HCR uses three steps to determine whether recreational management measures for an upcoming season should remain the same, be liberalized, or be restricted.  *See* Framework 17 Proposed Rule, 87 Fed. Reg. at 76,601; *see also* Framework 17 Final Rule, 88 Fed. Reg. at 14,506 ("There are no changes to the measures in this final rule from the proposed rule.").

---

[12]    Critically, stocks in a rebuilding plan are expressly excluded from the HCR.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,499.

First, the expected recreational harvest with current management measures is estimated, either using newly developed statistic models, if available, or based on the two most recent years of recreational fishing survey data. *See* Framework 17 Proposed Rule, 87 Fed. Reg. at 76,601. In recognition of the uncertainty laden in recreational fishing data, the 80-percent confidence interval is also calculated, which interval reflects the range of values within which the true value of the recreational harvest will be 80 percent of the time. *Id.*; *see also id.* at 76,602 (defining confidence interval as "the upper and lower bound around a point estimate to indicate the range of possible values given the uncertainties around the estimate"). The RHL for the next two years is then compared to the confidence interval. If the future RHL is greater than the upper bound of the confidence interval, harvest is expected to be lower than the RHL. *Id.* at 76,602. If the future RHL is within the confidence interval, harvest is expected to be close to the RHL. *Id.* If the future RHL is less than the lower bound of the confidence interval, harvest is expected to exceed the RHL. *Id.*

Second, the stock's biomass, based on the most recent stock assessment, will be compared to the biomass target, *i.e.*, the stock size associated with maximum sustainable yield. *Id.* at 76,601–02. The stock will be given one of three ratings: (1) very high, if the stock is at least 150 percent of the target; (2) high, if the stock is between 100 and 150 percent of the target; or (3) low, if the stock is below the target. *Id.* at 76,601.

Third and finally, the percentage change is determined using the Management Response Table, *see id.* at 76,602 (Table 1), a matrix that recommends a percentage change in harvest based on the information gathered in steps one and two. The recommendations encourage a more aggressive approach for fish with higher stock, by creating more opportunities to liberalize management measures and allowing for less reduction, and a more conservative and cautionary

approach for fish with lower stock.  Where, for example, the future RHL is less than the lower bound of the harvest estimate confidence interval—meaning that harvest is expected to exceed the RHL—but the fish has "very high" biomass, a 10-percent fixed reduction in harvest is recommended, regardless of the difference between the RHL and expected harvest.  Under the HCR, a percentage reduction based on the difference between the harvest estimate and future RHL, not to exceed 20 percent is recommended for a fish with "high" biomass; and the same but capped at 40 percent is recommended for fish with "low" biomass.  *Id.*  In contrast, where the future RHL is greater than the upper bound of the harvest estimate confidence interval, meaning that the harvest is expected to be lower than the RHL, a percentage liberalization based on the difference between the harvest estimate and future RHL, not to exceed 40 percent is recommended for fish with "very high" biomass; the same but with a 20-percent cap is recommended for fish with "high" biomass; and a fixed 10-percent liberalization in harvest is recommended for fish with "low" biomass.  *Id.*  Applying the percentage change to the estimated expected recreational harvest results in the RHT.  Pursuant to the HCR, recreational management measures, such as season length, minimum fish size, and bag limits, are then set to target the RHT.

The HCR remains the same as the status quo approach in three critical respects: the HCR (1) does not change the Specifications Framework; (2) compares the RHL and expected harvest to determine whether management measures should stay the same, be reduced, or be liberalized; and (3) has, as its end goal, achieving an actual harvest that is close to, but does not exceed, the RHL.  The HCR differs from the status quo approach in the means and timing of achieving its goals, privileging a more methodical and iterative process over the status quo approach, which chased the full gap between the expected harvest and RHL every single year.

Take an example where the estimated recreational harvest is expected to be lower than the RHL. Both the HCR and status quo approach recommend liberalization, so that the estimated recreational harvest comes closer to the RHL. Under the status quo approach, the aim would be to achieve the RHL immediately, meaning management measures would be liberalized to make up the full difference between the expected harvest and the RHL, no matter how significant the difference is, and with little regard to whether a species' stock is low or in abundance, or whether the gap to the RHL is due to recreational catch or imprecise data. Although the status quo approach would attempt to reach the RHL every year, it almost never has, given the problems with uncertain data, as outlined above. The HCR, in contrast, seeks to achieve the RHL more cautiously and incrementally, by relying on two-years' worth of data and capping the percent change. Newly built into the HCR is also recognition of the uncertainty of MRIP data, by employing the 80-percent confidence interval, and consideration of a stock's biomass, by requiring a more conservative approach for species with low biomass. Again, what the HCR does not change is the goal of achieving the RHL. Indeed, the percent change, and thus RHT, is calculated in reference to whether the RHL is greater or less than the relevant bound of the 80-percent confidence interval. The HCR merely refines how this goal is achieved. *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,501 ("The overall goal of the Percent Change Approach is to iteratively adjust management measures to achieve the RHL, while minimizing potential overreaction (overcorrection) to annual variability in the harvest estimates.").

## 2.    *Accountability Measures*

To align recreational accountability measures (or AMs), with the adoption of the harvest control rule (or HCR), Framework 17 modified AMs to include explicit consideration of whether a recreational overage actually contributed to overfishing, as opposed to a situation like with black sea bass, where recreational harvest has exceeded the RHL for years with no biological

impact on stock.[13]  Specifically, Framework 17 recommends that, when a reactive AM is triggered because of a recreational ACL overage, "the most recent estimate of fishing mortality . . . relative to the fishing mortality associated with MSY [or maximum sustainable yield]," *i.e.*, the rate of fishing mortality estimated to result in overfishing, also be considered. *Id.* at 14,500.  If the most recent fishing mortality is greater than the fishing mortality associated with MSY, meaning that the rate of fishing mortality is estimated to result in overfishing, the AM response should be stricter.  *See id.* (offering, as an example of a more restrictive response, imposing a mandatory payback).  If the most recent fishing mortality is less than the fishing mortality associated with MSY, meaning that the rate of fishing is not expected to result in overfishing, the AM response can be less strict.  *See id.* (offering, as an example of a less strict response, revising management measures without imposing a mandatory payback).  "When the relevant fishing mortality estimates are not available, this comparison would default to a comparison of total catch relative to the ABC."  *Id.*

### 3.    *2023 Recreational Management Measures*

The HCR was used for the first time to develop the 2023 recreational management measures.  *See* 2023 Recreational Management Measures Final Rule, 88 Fed. Reg. at 55,411.  As a reminder, the HCR affects the development of only management measures—not the overfishing limit, acceptable biological catch, annual catch limits, or recreational harvest limit (or, by acronym, OFL, ABC, ACLs, or RHL).  In a separate rulemaking, finalized in early 2023, NMFS had already set the 2023 specifications for all three species.  *See* Fisheries of the Northern United States; Final 2023 Summer Flounder, Scup, and Black Sea Bass Specifications, 88 Fed. Reg. 11, 12 (Jan. 3, 2023).  The 2023 RHLs for summer flounder, scup, and black sea bass were

---

[13]        In contrast to the percent change approach, the modified recreational accountability measures will not sunset in 2025.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,500.

set at 10.62 million pounds, 9.27 million pounds, and 6.57 million pounds, respectively.  *Id.*  The RHTs generated for all three species pursuant to the HCR were higher than these RHLs, as detailed next.

> ### a)   Scup

For scup, under existing management measures, the harvest was estimated to be 14.31 million pounds, and the 80-percent confidence interval was estimated as 11.55 to 16.26 million pounds.  *See* 2023 Recreational Management Measures Final Rule, 88 Fed. Reg. at 55,412. Since the RHL (9.27 million pounds) was less than the lower bound of the confidence interval, reduction was necessary (step one).  *See id.*  Based on the scup's "very high" rating (step two), the Management Response Table recommended a 10-percent fixed reduction, even though the difference between the estimated harvest under existing management measures and the RHL was more than 10 percent.  *See id.*  The RHT was thus 12.88 million pounds, a 10-percent reduction of 14.31 million pounds (step three).  *See id.*  The corresponding management measures were set as: (1) a 10-inch minimum fish size; (2) a 40-fish per person possession limit; and (2) an open season of May 1 through December 31.  *Id.*

> ### b)   Summer Founder and Black Sea Bass

For summer flounder and black sea bass, NMFS implemented conservation equivalency, under which "[f]ederal recreational measures are waived and federally permitted party/charter vessels and all recreational vessels fishing in [f]ederal waters are subject to the recreational fishing measures implemented by the state in which they land."  *Id.* at 55,411.  NMFS reasoned that "[t]his approach allows for more customized measures at a state or regional level that are likely to meet the needs of anglers in each area, as opposed to coastwide measures that may be advantageous to anglers in some areas and unnecessarily restrictive in others."  *Id.*  The implementation of conservation equivalency, however, does not render the HCR irrelevant

because "[t]he combination of state or regional measures must be 'equivalent' in terms of conservation to a set of 'non-preferred coastwide measures,' which are recommended by the Council and the Board each year" and are generated using the HCR. *Id.* In addition, state or regional measures are "designed to constrain landings to" the RHTs. *Id.* Accordingly, using the HCR, the RHT is still calculated, and default federal management measures are still developed. If conservation equivalency is not approved, the federal management measures come into effect. If conservation equivalency is approved, the recreational fishing measures required to be implemented in state waters must be the conservation equivalent of the season, fish size, and possession limits corresponding to the default federal management measures. The default federal measures for summer flounder and black sea bass were set as follows:

For summer flounder*,* application of the percent change approach generated conflicting results depending on the initial assumptions used in the model configuration. *See id.* at 55,415. When the 2021 MRIP data was used, the estimated harvest was 8.38 million pounds, below the RHL, and a 10-percent liberalization was recommended as a result. *See id.* In contrast, when an average of the 2018–2022 MRIP data was used, the estimated harvest was 10.92 million pounds, above the RHL, and a 10-percent reduction was recommended as a result. *See id.* Although the RHT was formally designated as 10.92 million pounds, this designation was found to be immaterial, given that 10.92 million pounds is "not statistically different" from the RHL of 10.62 million pounds. *Id.* In any case, "[g]iven the conflicting results, and uncertainty about which model run was more likely to reflect 2023 harvest, the [Mid-Atlantic] Council . . . decided to maintain status quo measures at the state and regional levels": (1) an 18-inch minimum fish size; (2) a 3-fish per person possession limit; and (3) an open season from May 15 through September 22. *See id.* at 55,415–16.

For black sea bass, the expected harvest under 2022 measures was estimated to be 7.93 million pounds, with a corresponding 80-percent confidence interval of 7.17 to 8.63 million pounds. *See id.* at 55,413. Since the bottom end of this range was greater than the 2023 RHL of 6.57 million pounds, a reduction was necessary (step one). *See id.* Based on black sea bass's "very high" stock status (step two), the matrix recommended a 10-percent fixed reduction, resulting in a RHT of 7.14 million pounds (step three), and corresponding management measures of: (1) a 15-inch minimum fish size; (2) a 5-fish per person possession limit; and (3) an open season of May 15 through September 8. *See id.* at 55,413, 55,416.

### 4. *2024 and 2025 Recreational Management Measures*

The percent change approach was again used for the 2024 and 2025 season. *See* 2024–2025 Recreational Management Measures Final Rule, 89 Fed. Reg. at 32,374. In late 2023, NMFS set 2024 and projected 2025 specifications for summer flounder and scup, and 2024 specifications for black sea bass. *See* Fisheries of the Northeastern United States; 2024 and Projected 2025 Specifications for the Summer Flounder and Scup Fisheries, and 2024 Specifications for the Black Sea Bass Fishery ("2024–2025 Specifications Final Rule"), 88 Fed. Reg. 88,266, 88,266 (Dec. 21, 2023).[14] Based on these specifications, the Mid-Atlantic Council then developed, through a separate rulemaking, 2024 and 2025 management measures for summer flounder and scup, as well as 2024 management measures for black sea bass, using the HCR. *See* Fisheries of the Northeastern United States; 2024 and 2025 Summer Flounder and Scup, and 2024 Black Sea Bass Recreational Management Measures ("2024–2025 Recreational Management Measures Proposed Rule"), 89 Fed. Reg. 13,674, 13,674 (Feb. 23, 2024); *see also*

---

[14] No new stock assessment was available for black sea bass, and thus NMFS deferred consideration of the 2025 specifications and management measures for this fish species. *See* 2024–2025 Specifications Final Rule, 88 Fed. Reg. at 88,267.

2024–2025 Recreational Management Measures Final Rule, 89 Fed. Reg. at 32,374 ("There are no changes from the proposed rule.").

*a)*    *Scup*

For scup, based on an estimated harvest of 15.29 million pounds, an 80-percent confidence interval of 14.07 to 16.29 million pounds, an average 2024 and 2025 RHL of 12.51 million pounds, and a "very high" stock category, the matrix recommended a 10-percent reduction, resulting in a RHT of 13.76 million pounds. *See* 2024–2025 Recreational Management Measures Proposed Rule, 88 Fed. Reg. at 13,675. This RHT exceeded both the 2024 and 2025 RHLs of 13.18 million pounds and 11.84 million pounds, respectively. *See* 2024–2025 Specifications Final Rule, 88 Fed. Reg. at 88,267. Although a 10-percent reduction was recommended, no changes to the federal recreational management measures for scup were implemented because the states had developed recreational management measures expected to result in a 10-percent decrease in harvest, and state waters account for over 90 percent of the recreational scup harvest. *See* 2024–2025 Recreational Management Measures Final Rule, 89 Fed. Reg. at 32,374; 2024–2025 Recreational Management Measures Proposed Rule, 88 Fed. Reg. at 13,675. The 2024 and 2025 recreational scup management measures were thus substantially similar to the 2023 management measures: (1) a 10-inch minimum fish size; (2) a 40-fish per person possession limit; and (3) a year-round open season. Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; 2024 and 2025 Summer Flounder and Scup, and 2024 Black Sea Bass Recreational Management Measures; Correction, 89 Fed. Reg. 49,817, 49,818 (June 12, 2024).

*b)*    *Summer Founder and Black Sea Bass*

For summer flounder and black sea bass, NMFS again implemented conservation equivalency. Their default federal measures are as follows:

For summer flounder, based on an estimated harvest of 8.88 million pounds, an 80-percent confidence interval of 8.10 to 9.48 million pounds, an average 2024 and 2025 RHL of 6.35 million pounds, and a "low" stock size category, a 28-percent reduction was recommended. "The resulting 2024–2025 [RHT] is equal to the RHL at 6.35 million [pounds]." *See* 2024–2025 Recreational Management Measures Proposed Rule, 89 Fed. Reg. at 13,676.  The default management measures were set as: (1) an 18.5-inch minimum fish size; (2) a 3-fish per person possession limit; and (3) an open season from May 8 to September 30.  *See* 2024–2025 Recreational Management Measures Final Rule, 89 Fed. Reg. at 32,374.

For black sea bass, since no new stock assessment was available, NMFS was unable to calculate the percent change and thus did not develop a new RHT.  *See* 2024–2025 Recreational Management Measures Proposed Rule, 89 Fed. Reg. at 13,677.  The 2023 management measures were used as the 2024 default federal management measures: (1) a 15-inch minimum fish size; (2) a 5-fish per person possession limit; and (3) an open season from May 15 to September 8. *See id.*  Based on these management measures, the 2024 recreational harvest was estimated to be 8.40 million pounds, which is greater than the 2024 RHL of 6.27 million pounds.  *See* 2024–2025 Specifications Final Rule, 88 Fed. Reg. at 88,267.

### F.    Procedural History

On April 10, 2023, within thirty days of the publication of the Framework 17 Final Rule, *see* 16 U.S.C. § 1855(f)(1), plaintiff brought this action, alleging that Framework 17 violated the MSA (Count One) and the APA (Count Two), *see* Compl. ¶¶ 61–83, and seeking vacatur of the framework adjustment, *see* Compl. (Prayer for Relief).  The American Sportfishing Association, representing recreational anglers, moved to intervene, and its motion was granted.  *See* Min. Order (July 27, 2023).

28

On August 28, 2023, over four months after the action was initiated but within thirty days of the publication of the final rule adopting the 2023 recreational management measures, plaintiff moved to amend its complaint, with consent by defendants and the intervenor.  *See* Pl.'s Unopposed Mot. to Amend Compl., ECF No. 21.  Plaintiff's motion was granted, *see* Min. Order (Aug. 29, 2023), adding to Counts One and Two, claims that the 2023 recreational management measures violated the MSA (Count Three) and APA (Count Four), *see* Am. Compl. ¶¶ 86–111, and seeking vacatur of the measures, *see id.* (Prayer for Relief).  In late 2023, the parties cross-moved for summary judgment on these four counts.

After briefing on the parties' cross-motions was completed, the 2024 and 2025 recreational management measures were finalized.  Within thirty days, plaintiff filed, unopposed by defendants, and with the Court's leave, *see* Min. Order (May 17, 2024), a second amended complaint, adding to the four existing counts, claims that the 2024–2025 management measures violated the MSA (Count Five) and APA (Count Six), *see* 2d Am. Compl. ¶¶ 114–39, and seeking vacatur of the measures, *see id.* (Prayer for Relief).  In June 2024, the parties supplemented their cross-motions on Counts Three and Four to address whether the 2023 recreational management measures are moot, now that the 2023 fishing season is over, and cross-moved for summary judgment on Counts Five and Six.

Briefing on the parties' cross-motions, addressing all six counts in the Second Amended Complaint, was completed on July 15, 2024, and these motions are now ripe for consideration.

## II.   LEGAL STANDARD

The MSA incorporates the APA's "arbitrary and capricious" standard of review.  *See* 16 U.S.C. § 1855(f)(1) (authorizing judicial review of regulations promulgated under the MSA "to the extent authorized by, and in accordance with" the APA); *see also Oceana, Inc. v. Ross*, 920

F.3d 855, 864 (D.C. Cir. 2019).  Under the APA, a court "shall" "hold unlawful and set aside

agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority."

5 U.S.C. § 706(2)(A), (C).

Agency action is arbitrary and capricious "if (1) the agency 'has relied on factors which

Congress has not intended it to consider'; (2) the agency 'entirely failed to consider an important

aspect of the problem'; (3) the agency's explanation 'runs counter to the evidence before the

agency'; or (4) the explanation 'is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934

F.3d 649, 663 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)).  A court engaged in arbitrary and capricious review

"must 'not substitute its own judgment for that of the agency,'" and "ordinarily uphold[s] an

agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory

explanation for its action, including a rational connection between the facts found and the choice

made.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alterations

in original accepted) (quoting *State Farm*, 463 U.S. at 43).[15]  Judicial review under the arbitrary

and capricious standard is "narrow," *State Farm*, 463 U.S. at 43, but is "not a rubber stamp,

and . . . must ensure that the agency considered all of the relevant factors," *Oceana, Inc.*, 920

F.3d at 863 (citation omitted).

In MSA and APA actions involving cross-motions for summary judgment, such as this

one, "the district judge sits as an appellate tribunal," since "[t]he entire case on review is a

question of law, and the complaint, properly read, actually presents no factual allegations, but

---

[15]     Intervenor's arguments, focusing on the HCR being the "better approach," are thus unhelpful.  *See* Int.'s
Opp'n at 9–12.

rather only arguments about the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citations omitted).

## III.   DISCUSSION

The Second Amended Complaint alleges, in six counts, that Framework 17's harvest control rule (or HCR) used by the Mid-Atlantic Council to regulate recreational fishing for summer flounder, scup, and black sea bass (Counts One and Two), and its application to generate the 2023 recreational harvest targets (or RHTs) (Counts Three and Four) and the 2024 and 2025 RHTs (Counts Five and Six) for these three fish species, violate the MSA and APA.  The parties have cross-moved for summary judgment on all six counts but have briefed, together, the MSA and APA claims associated with each rule.  Since the MSA incorporates the APA's "arbitrary and capricious" standard, the same approach will be taken here.  For the reasons set forth below, plaintiff's challenges to the HCR and the 2023, 2024, and 2025 RHTs fail.

### A.   Standing

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted).  "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (alteration in original accepted and citation omitted).  Constitutional standing has three elements: (1) injury-in-fact, *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation, *i.e.*, "a causal connection between the injury and the conduct complained of"; and (3) redressability, *i.e.*, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560–61 (1992) (citations omitted).  "In addition, when a representational

organization like NRDC sues on behalf of its members, it must also show that (1) 'its members

would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are

germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief

requested requires the participation of individual members.'"  *Nat. Res. Def. Council v. Wheeler*,

955 F.3d 68, 76–77 (D.C. Cir. 2020) (quoting *Nat. Res. Def. Council v. Env't Prot. Agency*, 755

F.3d 1010, 1016 (D.C. Cir. 2014)).

Here, plaintiff has satisfied its burden to show an injury caused by the HCR and the 2023,

2024, and 2025 RHTs likely to be redressed by a favorable decision.  Indeed, neither defendants

nor intervenor challenges plaintiff's standing to bring this action.  Nonetheless, "it is well

established that [a] court has an independent obligation to assure that standing exists, regardless

of whether it is challenged by any of the parties."  *Summer v. Earth Island Inst.*, 555 U.S. 488,

499 (2009).  In short, plaintiff alleges that Framework 17 removes ACLs "as a constraint on the

recreational fishery," thereby inviting ACL exceedances, encouraging overfishing, and risking

the health of summer flounder, scup, and black sea bass.  Pl.'s Mem. at 36; *see Defs. of Wildlife

v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) (explaining that, for purposes of standing, a

court must presume that petitioners will prevail on the merits).  Vacating the HCR and the 2023,

2024, and 2025 RHTs, as plaintiff requests, would clearly redress these harms.

With respect to associational standing, first, plaintiff has submitted declarations by two

NRDC members with "deep aesthetic and recreational interests in fishing for scup, black sea

bass, and summer flounder in federal waters in the Mid-Atlantic."  Pl.'s Mem. at 36; *see also

Lujan*, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely

esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Ctr. for*

*Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 136–37 (D.D.C. 2013) (finding that environmental organization had standing to sue based on individual member's asserted "recreational, aesthetic, and professional interests in the bluefin tuna," which interests "will be jeopardized by the Final Rule" (citation omitted)).  Second, "[t]he protection of the marine environment and the promotion of sustainable fishery management practices are central to NRDC's organizational purpose."  Pl.'s Mem. at 36; *see also Nat. Res. Def. Council v. Wheeler*, 955 F.3d at 78 (permitting "NRDC to proceed in a representational capacity in an environmental lawsuit"); *Nat. Res. Def. Council v. Env't Prot. Agency*, 755 F.3d at 1016 (same).  Third and finally, the participation of individual members is not necessary for the claims asserted, *i.e.*, that the HCR and the 2023, 2024, and 2025 RHTs violate the MSA and APA, or the relief requested, *i.e.*, vacatur of the regulations.  Accordingly, plaintiff has standing to bring this action.

### B.      Framework 17's Harvest Control Rule (Counts One and Two)

Plaintiff challenges the substance of the HCR as set out in Framework 17, as well as two justifications for the rule that defendants purportedly offered, as not in accordance with the MSA and arbitrary and capricious.  Significant overlap exists between plaintiff's substantive and procedural arguments, which nonetheless are addressed *seriatim*.

#### 1.      Substantive Challenge to the Harvest Control Rule

The contours of the parties' dispute over the HCR are somewhat elusive since they talk past each other in their briefing, with plaintiff focusing on the use of the phrase "annual catch limit" in 16 U.S.C. § 1853(a)(15), and defendants focusing primarily on National Standard 1, *see* 16 U.S.C. § 1851(a)(1).  Nonetheless, the parties appear to agree on two critical facts: (1) the HCR did not alter the Specifications Framework, the mechanism for specifying ACLs; and (2) the annual catch limit is an upper bound on a year's catch.  In broad strokes, then, the parties'

disputed question is: what does the MSA require that NMFS and the Mid-Atlantic Council do to stay below the established ACL?

In a bit of a moving target, plaintiff initially argues that management measures need only "manage" to the ACL, Pl.'s Mem. at 27, which is an uncontroversial position. Plaintiff, however, then criticizes the HCR for "severing" the development of recreational management measures from and "ignor[ing]" the ACL, in violation of the MSA. *Id.* at 24–25. The HCR, however, does no such thing.[16] Accountability measures, or AMs, are still triggered only when the ACL is exceeded, and the lynchpin in the decision whether to liberalize or restrict management measures remains the recreational harvest limit, or RHL. *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,501 ("[T]he Percent Change Approach does not eliminate the recreational ACL or RHL, and continues to use both in the process of setting measures, and evaluating accountability measures."). If the RHL is greater than the upper bound of the 80-percent confidence interval for expected harvest, liberalization is recommended to increase expected harvest. In contrast, if the RHL is less than the lower bound of the confidence interval, a reduction is recommended to decrease expected harvest. These are the same outcomes as the status quo approach. The HCR merely introduces the RHT, an additional reference point that has newly accounted for data uncertainty and a stock's biomass, in an effort to temper the *degree of change* in management measures from year-to-year—not to prevent a change in expected harvest in the direction of the RHL.

---

[16]    Intervenor's argument on this point is unhelpful. First, intervenor mischaracterizes plaintiff's argument by framing it as "stating [that] Framework 17 'severs' the ACL from its sole purpose of preventing overfishing." Int.'s Reply at 2 (citing Pl.'s Reply at 3). Plaintiff, instead, argues that Framework 17 "severs recreational management measures from the Recreational ACL." Pl.'s Reply at 3. Second, intervenor argues that "the ACL budgeting process for [the Summer Flounder, Scup, and Black Sea Bass FMP] has been nonsensical," and that "ACLs, ABC and OFLs for these fisheries are not functioning properly nor aligned with best available science." Int.'s Reply at 3–4. This argument is irrelevant because the Specifications Framework, which is the process of establishing the ACL, is not in dispute in the instant action.

Plaintiff posits a highly prescriptive role for the ACL, such that the ACL must be the sole controlling value for setting management measures; that is, management measures must be set to produce an estimated harvest at, or below, the RHL.  *See* Pl.'s Mem. at 25 (criticizing Framework 17 for "creat[ing] a wholly different level of recreational landings called the [RHT]," and authorizing the setting of "management measures to achieve, but not exceed, this new target" (citation omitted)); Pl.'s Suppl. Reply at 10 ("Framework 17 is fundamentally flawed because it demotes the Recreational ACL to a mere input in the decision matrix.").  For the reasons set forth below, plaintiff fails to persuade.

### a)  *Management Measures Need Not Exclusively Target the ACL*

Plaintiff's principal argument is that the MSA's Section 1853 means what it says: providing for "annual catch limits" means setting "caps not to be exceeded."  Pl.'s Mem. at 23. By focusing primarily on the definition of "annual catch limit," plaintiff ignores that the question in dispute concerns not the ACL itself, but the means that NMFS and the Mid-Atlantic Council must adopt to achieve the ACL; specifically, whether recreational management measures must be calibrated exclusively to the ACL.  The three words "annual catch limits" do not answer this question.

Section 1853(a)(15) requires fishery management plans, or FMPs, to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).  This text is unambiguous.  Section 1853(a)(15) mandates a mechanism for specifying ACLs at a level such that overfishing does not occur.  That the Summer Flounder, Scup, and Black Sea Bass FMP has satisfied this requirement is undisputed.  Indeed, plaintiff does not challenge the mechanism by which defendants developed specifications, "including" the ACL, which

mechanism Framework 17 did not alter.  *See* Pl.'s Suppl. Mem. at 2 (conceding that plaintiff

does not challenge defendants' development of specifications, "including" ACLs).

Section 1853(a)(15) also mandates that "measures" be enacted "to ensure accountability."

No further specificity is provided on how "accountability" must be "ensure[d]."  *See Oceana,*

*Inc. v. Pritzker*, 24 F. Supp. 3d 49, 69 (D.D.C. 2014) ("The MSA does not specify what AMs are

sufficient to satisfy this statutory requirement.").  The plain meaning of "accountability" is "the

quality or state of being accountable," "especially," "an obligation or willingness to accept

responsibility or to account for one's actions."  *Accountability*, Merriam-Webster,

https://www.merriam-webster.com/dictionary/accountability; *see Accountable*, Merriam-

Webster, https://www.merriam-webster.com/dictionary/accountable ("subject to giving an

account"; "answerable"); *see also Accountability*, Oxford Eng. Dictionary,

https://www.oed.com/dictionary/accountability_n ("The quality of being accountable; liability to

account for and answer for one's conduct, performance of duties, etc.").  Accordingly, to "ensure

accountability" to the ACL, a measure needs to impose obligations when the ACL is exceeded to

prevent future exceedances.  The summer flounder, scup, and sea bass AMs do just that,

triggering "[i]f the recreational ACL is exceeded."  50 C.F.R. §§ 648.103(d),

648.123(d), 648.143(d); *see also id.* §§ 648.103(d)(2)(i), 648.123(d)(2)(i), 648.143(d)(2)(i)

(instructing that adjustments are made to recreational management measures "[i]f the

Recreational ACL has been exceeded").  Again, plaintiff does not challenge the summer

flounder, scup, and sea bass AMs, or Framework 17's modifications to the AMs.  *Cf.* Pl.'s Mem.

at 34–35.

Given the text of statute, having concluded that defendants have established a mechanism

for specifying ACLs and have enacted measures to ensure accountability, the analysis of whether

defendants have satisfied Section 1853(a)(15) should end here.  Plaintiff, however, tries to take Section 1853(a)(15) a step further, seizing on the three words, "annual catch limit," as the lynchpin to argue, based purportedly on the phrase's plain meaning and legislative history, that every regulation must use the ACL as its "north star," *id.* at 1, such that every fishery management tool must set the ACL as its one and only goal, *see id.* at 23.  The phrase "annual catch limit" is not defined, and plaintiff is certainly correct that when a term is not defined, the plain meaning controls.  *See id.*; *see also United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002); *King v. Burwell*, 576 U.S. 473, 486 (2015).  Discerning the plain meaning of "annual catch limit," however, does not end this instant dispute, where the question is not how to define ACL, but what relationship, if any, the MSA requires between the ACL and season-specific recreational management measures.  On this question, Section 1853(a)(15) is silent.

National Standard 1 is the only MSA provision cited by the parties that addresses management measures and provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).  By its terms, rather than mandate that management measures exclusively target the ACL, NS1 sets different targets for management measures: (1) to prevent overfishing, and (2) to achieve optimum yield (or OY), on a continuing basis. *See infra* Part III.B.1.b.  While the ACL serves as a proxy for preventing overfishing, NS1 requires more than simply achieving that goal and, thus, the ACL is not the exclusive guidepost in assessing the adequacy of management measures.

The NS1 Guidelines confirm that management measures do not have to be set to immediately restore catch to below the ACL.[17]  ACL is defined as "a limit on the total annual

---

[17]     The parties appear implicitly to agree that the NS Guidelines are entitled some deference, *see* Pl.'s Reply at 13; Defs.' Opp'n at 25 n.12; *see also Guindon v. Pritzker*, 31 F. Supp. 3d 169, 198 (D.D.C. 2014) (concluding that

catch of a stock or stock complex, which cannot exceed the ABC, that serves as the basis for invoking AMs." 50 C.F.R. § 600.310(f)(1)(iii).  This definition encompasses not only the plain meaning of ACL ("a limit on the total catch of a stock"), but also the consequence of exceeding the ACL ("invoking AMs"), though no specificity is provided on what AMs must do, once invoked.

The NS1 Guidelines then define AMs, which fall into "two categories": (1) inseason AMs, *i.e.*, "management controls to prevent ACLs, including sector-ACLs, from being exceeded"; and (2) "AMs for when the ACL is exceeded," *i.e.*, "management controls . . . to correct or mitigate overages of the ACL if they occur." *Id.* § 600.310(g)(1).  For AMs in the latter category that are responsive to overages, the NS1 Guidelines requires councils, "[o]n an annual basis," to "determine as soon as possible . . . if an ACL was exceeded." *Id.* § 600.310(g)(3).[18]  If so, "AMs must be implemented as soon as possible to correct the operational issue that caused the ACL overage." *Id.*  The guidelines acknowledge that "[t]he type of AM chosen by a Council will likely vary depending on the sector of the fishery, status of the stock, the degree of the overage, recruitment patterns of the stock, or other pertinent information," and offer a nonexclusive list of examples of AMs, including "modifications of inseason AMs, the use or modification of ACTs, or overage adjustments." *Id.*; *see also id.* § 600.310(g)(1) (listing "annual catch compared to the ACL" as only one of several examples of data that can "be used to implement AMs").  In sum, while the NS1 Guidelines reinforce that the goal of AMs is to reach the ACL, this guidance does not impose a specific period of time ("as

_____

the NS Guidelines are entitled to "considerable deference" under *United States v. Mead Corp.*, 533 U.S. 218 (2001), "in light of their thoroughness, the agency's expertise, and the administrative formalities involved in their promulgation"), but they are cited here only as persuasive authority rather than as being entitled to deference.

[18]     The summer flounder, scup, and black sea bass fisheries do not have recreational inseason AMs.  *See* 50 C.F.R. §§ 648.103, 648.123, 648.143.

soon as possible"), type of AM, dataset, or method to do so.  *Cf.* Defs.' Opp'n at 23 (arguing, as well, that the use of the word "mechanism" in Section 1853(a)(15) "seems to imply a more dynamic process that allows for adjustment of management measures as a fishery is carried out" (citation omitted)).  The NS1 Guidelines certainly do not mandate that each AM, or even the suite of AMs, be calibrated to only the ACL.  Rather, councils are left with significant discretion to craft AMs to respond to ACL overages, instructing that "AMs should address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage in as short a time as possible."  50 C.F.R. § 600.310(g)(1).[19]

Plaintiff relies on *Conservation Law Foundation v. Pritzker*, *see* Pl.'s Mem. at 26, which addressed a challenge to Framework 50 of New England's Mutispecies FMP, *see* 37 F. Supp. 3d at 258, limiting commercial fishers' catch in 2013 to not only their allocated ACL, but also a 10-percent carryover of their prior year's catch "[i]n an effort to soften the blow of the lowered" ACLs suggested by the SSC, *id.* at 265–66.[20]  The sum of the ACL and carryover was called "total potential catch," which was, by definition, always greater than the ACL and had exceeded, for the 2013 year, the SSC's recommended ACL for 13 stocks of fish.  *Conservation L. Found.*, 37 F. Supp. 3d at 266.  Reasoning that "[t]he 'total potential catch' plainly is an ACL, and ACLs may not exceed the Committee's recommended levels," *id.* at 267, the Court vacated Framework 50 and its implementing rule, concluding that the "total potential catch" was a workaround that

---

[19]    Indeed, the final sentence of this provision reads: "For stocks and stock complexes in rebuilding plans, the *AMs should include overage adjustments that reduce the ACLs in the next fishing year by the full amount of the overage*, unless the best scientific information available shows that a reduced overage adjustment, or no adjustment, is needed to mitigate the effects of the overage."  50 C.F.R. § 600.310(g)(3) (emphasis added).  By specifically mandating the reduction of ACLs "by the full amount of the overage" for stocks in rebuilding plans—to which the HCR does not apply—the NS1 Guidelines indicate that had NMFS wanted to impose a similar requirement on the setting of management measures for all stock, it could have.

[20]    "Carryover is, in essence, catch that was allocated to fishers but remained uncaught in the prior fishing year."  *Conservation L. Found.*, 37 F. Supp. 3d at 260.

"circumvented" the ACL, *id.* at 266.  "Common sense would indicate that this procedure—which resulted in catch limits above the statutorily permissible levels—contravenes the plain language of the Act."  *Id.* at 266; *see also* 16 U.S.C. § 1852(h)(6) (providing that ACLs "may not exceed the fishing level recommendations" of the SSC).

The instant action is distinguishable.  Most fundamentally, Framework 50 replaced the ACL with a new value called the "total potential catch," which, being the sum of the ACL and carryover from last year, was, by definition, greater than the ACL.  Commercial fishers were permitted to catch up to the ACL, plus an additional 10-percent carryover of their prior year's catch.  The HCR, in contrast, neither affects the process of establishing the ACL, nor replaces the ACL with any other value.  Instead, the HCR merely prescribes a method to determine to what degree recreational management measures should be adjusted from year-to-year.  Certainly, management measures bear on harvest, and an adjustment of management measures, using the HCR, can affect the likelihood that a year's harvest will remain under the ACL—but these facts do not make the RHT an ACL.  Under the HCR, the ACL is still calculated via the Specifications Process, exceeding the ACL still triggers AMs, the implementation of the recreational ACL is still the goal, and the determination of whether recreational catch needs to increase or decrease still turns on whether expected harvest is greater or less than the RHL.  *See* Defs.' Opp'n at 35 ("[T]he instant case involves the process for developing recreational management measures that attempt to implement recreational ACLs by predicting how the recreational fisheries will respond to particular management measures." (emphasis omitted)).[21]

---

[21]     In addition, whereas the 10-percent carryover was permitted specifically to allow commercial fishers to overshoot the ACL "[i]n an effort to soften the blow of the lowered" ACLs suggested by the SSC, *Conservation L. Found.*, 37 F. Supp. 3d at 265, the HCR was adopted to prevent overfishing, by minimizing the effects of the uncertainty and imprecision inherent in recreational fishing data, accounting for a stock's biomass, and adding stability to and limiting aggressive swings in recreational management measures.

In a last-ditch attempt to tether its argument to the text of the MSA, plaintiff argues that Framework 17 violates Section 1854(b)(1), which requires framework adjustments to be "consistent with the fishery management plan." 16 U.S.C. § 1854(b)(1). Specifically, plaintiff asserts that when the RHT is substituted for the RHL and the cascading Specifications Framework is applied bottom-up to generate, from the RHT, the recreational ACL, ACL, ABC, and OFL, these resultant values can be greater than the specifications set for the year. *See* Pl.'s Suppl. Mem. at 17–19, 29–30; *see also* Pl.'s Reply at 29. This argument falls flat since it is based on two flawed assumptions. First, as explained, recreational management measures do not have to be calibrated exclusively to the ACL or the corollary RHL. Second, the RHT is used to determine management measures—not as a substitute for the RHL, which is a limit on the year's catch. The HCR still looks to the RHL to determine whether and to what extent management measures need to be liberalized or restricted; the HCR merely imposes limits to cap the percent change from year-to-year, resulting in the RHT, which reflects an effort to make more methodological and iterative the process of reaching the RHL. Importantly, when the RHT is exceeded, nothing happens, given that RHT is simply an estimated harvest, used to develop management measures. In contrast, when the RHL is exceeded, the HCR imposes consequences, and when a year's recreational harvest is greater than the recreational ACL, recreational AMs are triggered.

> b) *Management Measures Must Prevent Overfishing and Achieve Optimum Yield on a Continuing Basis*

Having established that the MSA does not require the ACL to be the exclusive target of management measures, review of what the MSA requires of management measures is helpful to avoid any implication that management measures may be set willy-nilly. As indicated above, National Standard 1, the only provision cited by the parties that addresses management

measures, sets out the twin aims: (1) to prevent overfishing, and (2) to achieve OY, on a

continuing basis. 16 U.S.C. § 1851(a)(1); *see id.* § 1853(a)(1)(C) (providing that FMPs must

conform with National Standards); 50 C.F.R. § 600.310(f)(4)(iv) ("The dual goals of NS1 are to

prevent overfishing and achieve OY on a continuing basis."); *see also* 16 U.S.C. § 1801(b)(4)

(listing, as a purpose of the MSA, the need "to provide for the preparation and implementation,

in accordance with national standards, of fishery management plans which will achieve and

maintain, on a continuing basis, the optimum yield from each fishery"); *id.* § 1853(a)(1)(A)

(providing that FMPs must contain measures "necessary and appropriate for the conservation and

management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect,

restore, and promote the long-term health and stability of the fishery").[22]  In simple terms,

overfishing is the rate of "fishing mortality that jeopardizes the capacity of a fishery to produce

the maximum sustainable yield [(or MSY)] on a continuing basis," 16 U.S.C. § 1802(34), and

OY is "the amount of fish" that "will provide the greatest overall benefit to the Nation," *id.*

§ 1802(33).

     In defendants' view, the changes reflected in the harvest control rule (or HCR) are

justified to align better with NS1's instruction that management measures aim to prevent

overfishing and to achieve OY on a continuing basis.  *See* Defs.' Opp'n at 27–31.  Both OY and

overfishing are values measured with reference to quantity of fish, indicating that the setting of

management measures requires consideration of a fish's stock, for which the HCR uses biomass

as a proxy.  In addition, OY must be achieved "on a continuing basis," 16 U.S.C. § 1801(b)(4),

and a stock is not deemed overfished unless its fishing mortality risks the species' capacity "to

produce the [MSY] on a continuing basis," *id.* § 1802(34).  Read together, these provisions

---

[22]    Defendants' arguments that the HCR complies with NS2 need not be addressed, *see* Defs.' Opp'n at 25–27, because plaintiff does not contend that the HCR violates this National Standard, *see* Pl.'s Reply at 28.

indicate that the setting of management measures should consider sustainability and longevity, as well as results.  The HCR attempts to strike this balance, by eliminating extreme fluctuations in management measures and adopting an incremental approach to conforming harvest to the RHL, which remains the goal of the HCR.

Consider a stock with low biomass.  The HCR requires a more conservative approach for such stock, which aligns with goal of overfishing.  "This is because the conservation risk associated with overages is greater for stocks that are less abundant, whereas stocks that are well above their target biomass are more robust to higher levels of fishing mortality."  Framework 17 Final Rule, 88 Fed. Reg. at 14,501.  When the RHL is greater than the harvest estimate, the HCR recommends a 10-percent liberalization, even if the difference between the RHL and harvest estimate is greater than 10 percent, to protect this vulnerable stock.  *See id.* at 14,499.  Under the status quo approach, management measures would have been liberalized, without restraint, to reach the RHL and, in doing so, could place significant pressure on the declining stock, especially when the difference between the RHL and harvest estimate is large.  *See id.* at 14,501; *see* Pl.'s Reply at 19 (conceding that if Framework 17 only "temper[ed] sharp liberalizations in management measures for low-biomass stocks . . . , there would be no dispute among the parties about its legality").  When the RHL is equal to the harvest estimate, whereas the status quo requires no change to management measures, the HCR requires a 10-percent reduction to be safe, in light of the uncertainty of recreational fishing data.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,500.  When the RHL is less than the harvest estimate, the HCR recommends restriction of management measures to reduce catch towards the RHL, capped at a 40-percent reduction.  *See id.*  Under the status quo approach, management measures would have been restricted to make up the full distance between the estimated harvest and the RHL, with no

restrictions.  In this particular circumstance, the HCR could set management measures that result in a harvest that is greater than the RHL, but given the discretion the MSA gives NMFS, and the significant year-to-year swing in data with no guarantee that the swings are due to actual fishing trends rather than poor datasets, defendants rationally concluded that a slightly more conservative reduction—albeit one that can still be as high as a 40-percent reduction—is prudent to ensure that any changes are in the right direction.[23]

Now compare a stock with very high biomass.  When the RHL is greater than the estimated harvest, the HCR recommends liberalization of management measures to increase catch towards the RHL, capped at a 40-percent increase.  *See id.* at 14,499.  The HCR's approach to increasing catch is thus more conservative than the status quo approach for both stock with low and stock with very high biomass, reflecting that preventing overfishing, while accounting for scientific uncertainty, remains a priority.  When the RHL is equal to the estimated harvest, the HCR recommends a 10-percent liberalization, and when the RHL is less than the estimated harvest, the RHL recommends a 10-percent reduction.  *See id.* at 14,500.  In these two circumstances, the HCR could set management measures that, alone, result in a harvest that is greater than the RHL.  In permitting such outcome, however, the HCR heeds NS1's guidance that preventing overfishing must be balanced with achieving OY on a continuing basis and decides that, for species in more abundance, the balance is best struck as such.  *See id.* at 14,504 ("These types of allowances and flexibilities, when the stock size is very high, help to balance the needs of the fisheries in an effort to achieve optimal yield, without causing unnecessarily severe social and economic disruptions that do not address a corresponding biological need."); *see also Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 65 (D.D.C.

---

[23]        To further minimize the possibility that RHL overages will have negative biological impacts, the HCR does not apply to fish in rebuilding plans.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,499.

2014) (Brown Jackson, J.) (noting that "[i]t is clear beyond cavil that the Magnuson-Stevens Act does not direct the NMFS to consider minimizing overfishing *exclusively*, nor does it require the agency to prioritize that factor to the exclusion of all other considerations," and that, "had Congress charged the Secretary with merely preventing overfishing, the Secretary likely would have responded with eliminating fishing together" (alteration in original accepted and citation omitted)).[24]

NMFS struck a difference balance under the status quo approach—one that tilted more in favor of preventing overfishing, but with less regard for achieving OY on a continuing basis, even for fish with very high biomass.  Take, for example, black sea bass.  Under the old approach, management measures were set yearly in an effort to reduce estimated catch to the RHL.  Despite these efforts, "the black sea bass RHL was exceeded every year from 2012 through 2021, except 2017," with "estimated recreational harvest ranging from 97 to 241 percent of the RHL."  Framework 17 Final Rule, 88 Fed. Reg. at 14,504.[25]  As a result, the black sea bass management measures were "the most restrictive they have ever been."  *Id.*  Although this record might suggest that black sea bass was at risk of overfishing, black sea bass stock for the 2023 season had "a very high biomass (150 percent or more above the biomass target)."  *Id.* at 14,502.  Since the estimated harvest was still "projected to be greater than the upcoming RHL," *id.*, the status quo approach would have required further restrictive management measures, which would arguably be inconsistent with attaining OY, as NS1 requires, *see* 16 U.S.C. § 1802(33)

---

[24]    To be clear, the Court does not suggest that fish with high biomass cannot be overfished, only that NMFS's decision to balance the need to prevent overfishing and the need to achieve OY on a continuing basis, as reflected in the HCR, is consistent with the MSA.

[25]    To the extent plaintiff argues that the adoption of the HCR was arbitrary and capricious because the status quo approach is more aligned with the requirement that AMs correct ACL overages "as soon as possible," Pl.'s Reply at 33 (quoting 50 C.F.R. § 600.310(g)(3)), this argument fails, since plaintiff points to nothing in the record to support this position, and the record shows that the status quo approach led to repeated ACL overages.

(explaining that OY should be evaluated "particularly with respect to food production and recreational opportunities").[26]

The HCR changed the recommended response in such circumstance, setting management measures to achieve a 10-percent reduction in harvest, even if the difference between the estimated harvest and RHL is greater than 10 percent. NMFS found that "[t]he conservation risk of this temporary approach, which reduces the magnitude of a needed reduction compared to what would occur with the current approach, on a stock that is over 150 percent of its biomass target is negligible." Framework 17 Final Rule, 88 Fed. Reg. at 14,502. If, in the next year, estimated catch remains higher than the RHL, reductions would occur again, until the stock's biomass is deemed "high" rather than "very high," and again, until the estimated catch is equal to the RHL.[27] This gradual approach provides more regulatory stability to the recreational fishing industry by allowing NMFS to confirm, through this iterative process, that a given year's fishing data reflects the accurate relationship between the RHL and estimated harvest, before making significant changes to the management measures, with little risk of overfishing. *See id.* ("This scenario, where a stock continues to maintain a biomass significantly above the target, does not constitute overfishing."). The HCR also reduces the risk of overreacting and overcorrecting to variability in yearly harvest estimates, while keeping as its goal to reach the RHL, albeit iteratively.

---

[26]     Under the status quo approach, a similar phenomenon was happening with scup stock. In 2022, despite scup biomass being "two times larger than the biomass target," NMFS proposed "a closure of the Federal scup fishery despite the high stock levels," which "drastic action" was "required" "not because the stock was at risk, but because the measures proposed by the [Mid-Atlantic] Council would not fully constrain harvest to the RHL." Framework 17 Final Rule, 88 Fed. Reg. at 14,504. "Ultimately, given the biological, social, and economic considerations, [NMFS] did not implement the closure," but "[t]he fact that the previous process and regulations often resulted in a required restrictive action that was not based on an actual risk of overfishing highlights the necessity for change." *Id.*

[27]     If a stock's biomass falls below its biomass target, the more conservative provisions that apply to lower stock species will kick in.

In this way, the HCR sets management measures that not only help achieve OY, but also do so sustainably. *See* 16 U.S.C. § 1851(a)(1) (explaining that OY should be achieved "on a continuing basis"); *id.* § 1802(34) (defining overfishing as the rate of fishing mortality that risks the ability a fish to produce the MSY "on a continuing basis"). By repeatedly ensuring that any difference between recreational harvest and the recreational ACL is due to fishing, rather than data uncertainty or other non-fishing-related factors, the HCR may also "address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage" in a shorter time than under the status quo approach. 50 C.F.R. § 600.310(g)(1). Under both the HCR and the status quo approach, the adjustment of management measures continues to "ensure accountability," 16 U.S.C. § 1853(a)(15), because they are triggered whenever the RHL is exceeded, and because they recommend the adoption of management measures that bring the expected harvest closer to the RHL. The primary difference between the two approaches is the extent to which these measures are adjusted yearly to bring the expected harvest to the RHL.

Plaintiff lodges various critiques of the HCR, contending, for example, that management measures are not the proper vehicle to address defendants' concerns about poor data and the failure to consider biomass, and noting that these concerns "can and should be addressed earlier in the catch limit setting process." Pl.'s Reply at 26. Relatedly, plaintiff criticizes Framework 17, for "seek[ing] to double count factors already considered by the [SSC] when setting the upper limits on catch, thereby improperly yielding higher catch levels for the recreational fishing sector." *Id.* Since scientific uncertainty (when the OFL is reduced to the ABC) and stock size (when calculating the OFL) are already considered during development of the RHL, plaintiff suggests that these factors cannot again be considered for recreational fisheries, without also being considered for commercial fisheries. *See id.*

47

Plaintiff's position, however, is contradicted by the MSA, which expressly acknowledges that "recreational fishing and commercial fishing are different activities," and provides that "science-based conservation and management approaches should be adapted to the characteristics of each sector."  16 U.S.C. § 1801(a)(13).  Indeed, in other parts of fishery management, the Mid-Atlantic Council has drawn distinctions between the recreational and commercial sectors, in light of the difficulties of predicting recreational catch.  *See supra* Part I.B (describing difficulties with regulating the recreational sector).  For example, the summer flounder, scup, and sea bass AMs, which plaintiff does not challenge, attempt to counteract the uncertainty and variability in recreational fishing data, while recognizing that the same need not be done for the commercial sector.  The AMs evaluate the recreational ACL "based on a 3-year moving average comparison of total catch," 50 C.F.R. §§ 648.103(c), 648.123(c), 648.143(c), whereas "[t]he commercial sector ACL [is] evaluated based on a single-year examination of total catch," *id.* §§ 648.103(a)(1), 648.123(a)(1), 648.143(a)(1).  *Compare, e.g.*, *id.* § 648.103(d)(1) (explaining that if "the recreational ACL has been exceeded, then the exact amount, in pounds, by which the most recent 3-year average recreational catch estimate exceeded the most recent 3-year average recreational ACL will be deducted, in the following fishing year, or as soon as possible), *with id.* § 648.103(b)(3)(i) (same for the commercial ACL, but using "the most recent year's commercial catch estimate" and "the most recent year's commercial ACL"); *compare, e.g.*, *id.* § 648.103(d)(2)(ii)(A) (explaining that a reduction in the recreational ACT will be in "the exact amount, in pounds, of the product of the overage, defined as the difference between the most recent 3-year average recreational catch and the most recent 3-year recreational ACL, and the payback coefficient"), *with id.* § 648.103(b)(3)(ii)(B) (same for the commercial ACT, but

using only one year's data).[28]  The summer flounder, scup, and sea bass AMs also include

measures to guarantee stability from year-to-year, such as permitting paybacks to "be evenly

spread over 2 years if doing so allows for the use of identical recreational management measures

across the upcoming 2 years," *id.* §§ 648.103(d)(1), 648.123(d)(1), 648.143(d)(1), without

offering the same 2-year period for the commercial sector, *see id.* §§ 648.103(b)(2)(ii),

648.123(b)(2)(ii), 648.143(b)(2)(ii).  In sum, NMFS's attempt to minimize the effects of

uncertain and unreliable recreational catch data and to promote regulatory stability for

recreational fishing by adopting the HCR does not constitute impermissible "double

count[ing]."[29]

## 2.    *Justification for the Harvest Control Rule*

In addition to challenging the substance of Framework 17, plaintiff takes issue with two

of NMFS's responses to comments on the Framework 17 Proposed Rule, interpreting these

responses as justifying the HCR by suggesting that (1) the recreational sector can borrow quota

from the commercial sector, and (2) reactive AMs save Framework 17 from illegality.  *See* Pl.'s

Mem. at 28–35.  As discussed in more detail below, however, when read in context, neither

NMFS response actually suffers from the flaws plaintiff identifies, and thus do not support the

finding plaintiff urges that NMFS "entirely failed to consider an important aspect of the

problem."  *Id.* at 32 (quoting *State Farm*, 463 U.S. at 43); *see also Judulang v. Holder*, 565 U.S.

42, 52 n.7 (2011) (noting that "arbitrary or capricious review under the APA" is the "apt

---

[28]    Although only the summer flounder AM is cited, the scup and sea bass AMs include identical provisions.

[29]    In addition, while the NS1 Guidelines instruct that the ACL may be set below the ABC to account for "management uncertainty," 50 C.F.R. § 600.310(f)(4)(i), and the Omnibus Amendment provides that sector ACLs may be reduced to the ACT also to account for management uncertainty, *see* Omnibus Amendment, 76 Fed. Reg. at 60,607, the ACL is set equal to the ABC and the sector ACLs are set equal to the sector ACTs for summer flounder, scup, and black sea bass.

analytical framework" when the agency's decision "is not an interpretation of any statutory language" (alteration in original accepted)).[30]

### a)    Borrowing from the Commercial Sector

According to plaintiff, NMFS minimized the possibility that, under the HCR, recreational harvest would exceed the recreational ACL, by reasoning that "the recreational sector could essentially borrow from the commercial sector's side of the ledger," which "was unlikely to use its full allocations," thereby "sav[ing] the fishery from exceeding the overall [ACL]."  Pl.'s Mem. at 28 (citing Framework 17 Final Rule, 88 Fed. Reg. at 14,502).  This reasoning, plaintiff argues, is arbitrary and capricious and not in accordance with the law.  *See id.* at 28, 32.[31]

Plaintiff mischaracterizes the record.  One comment letter, submitted in response to the Framework 17 Proposed Rule, stated: "[W]hile recreational harvest may be projected to exceed an RHL, this does not always, and often has not, resulted in overfishing.  Given that the OFL is fully allocated, one of the few ways this statement can be true is if commercial under harvest exists and is relied upon to offset recreational exceedances."  Framework 17 Final Rule, 88 Fed. Reg. at 14,502.  In response, NMFS stated:

> It is true that the impact from recreational overages may be "balanced" by a commercial underage or vice versa *in the evaluation of overfishing*.  This is not a new feature of this approach, nor is it unique to these fisheries.  This approach does not take away quota from the commercial fishery or prevent commercial vessels from harvesting their entire allocated quota, and thus does not represent a *de facto* reallocation of quota.  It is simply the reality of overfishing and overfished statuses

---

[30]    Even if plaintiff's characterization of NMFS's responses were correct, the critiques are largely duplicative of arguments made in support of plaintiff's challenge to the substance of Framework 17, *see, e.g.*, Pl.'s Mem. at 28 (arguing, again and "[f]or the reasons explained above," that the ACL "must be treated as actual limits, and fishery managers must manage to those limits"); *id.* at 29 (arguing again that "NMFS may not approve framework adjustments or other measures that are inconsistent" with the FMP); Pl.'s Reply at 29 (arguing again that the HCR replaces the RHL with the RHT), and are thus unpersuasive, for the reasons explained.  *See supra* Part III.B.1.

[31]    To the extent plaintiff's arbitrary-and-capricious argument rests on concerns raised by the Mid-Atlantic Council's own staff and SSC, *see* Pl.'s Mem. at 15–16, 30–31, these preliminary statements are not the proper focus of such review, *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007) ("[F]ederal courts ordinarily are empowered to review only an agency's *final* action," and not the "various statements made by the involved agencies' regional offices during the early stages of consideration").

being determined based on all mortality and not sector-specific considerations.  *To the extent that there is overfishing as a result of a recreational overage, AMs would be applied to the recreational fishery*, not the commercial fishery.

*Id.* (emphasis added).

Read in context, NMFS does not justify the possibility of a recreational harvest greater than the RHL by pointing to commercial underage.  NMFS simply explains that recreational harvest overage does not always result in a finding of overfishing.  Overfishing, defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis," 16 U.S.C. § 1802(34), does not distinguish between recreation and commercial harvest.  Accordingly, when evaluating whether a species is overfished—a separate question from whether the ACL has been exceeded—commercial underage might offset recreational overage in the calculation of fishing mortality.

On the flip side, a finding that a species is not overfished does not mean that the recreational ACL has not been exceeded.  In fact, NMFS confirms several times, in response to different comments, that when the recreational harvest exceeds the recreational ACL, recreational AMs will still be triggered to reduce recreational fishing and the RHT will be reduced.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,502–04; *see also* Defs.' Opp'n at 41 (acknowledging, again, that under the HCR, "where recreational harvests are expected to exceed the RHL, the recreational harvest target may be reduced in successive years until recreational harvests become aligned with the RHL" (citing Framework 17 Final Rule, 88 Fed. Reg. at 14,500; 2023 Recreational Management Measures Final Rule, 88 Fed. Reg. at 55,417)).  Reference to any balancing between commercial fishery overage and recreational fishery underage is relevant to only the question whether a conservation issue exists; "a sector-specific (recreational or commercial) ACL overage may not be a conservation issue, if overall fishing

mortality [across the sectors] does not exceed the target."  Framework 17 Final Rule, 88 Fed. Reg. at 14,504.

Plaintiff relies on *Guindon v. Pritzker*, *see* Pl.'s Mem. at 39, which concerned the Gulf of Mexico Fishery Management Council's FMP for managing red snapper, 31 F. Supp. 3d 169, 178 (D.D.C. 2014), to which the Omnibus Amendment does not apply.  Under the FMP at issue in that case, a red snapper "quota" is set, then divided such that "the commercial sector receives 51 percent of the quota and the recreational sector receives 49 percent."  *Guindon*, 31 F. Supp. 3d. at 178.  During the 2013 fishing season, despite reliable evidence that the recreational quota had been exceeded, NMFS reopened the fall season, a decision that was determined to create a "de facto allocation of quota from the commercial to the recreational sector" and to violate the MSA's requirement of consistency between the FMP and implanting regulations.  *Id.* at 200. *Guindon* is plainly distinguishable because the HCR does not affect commercial quota.  *See* Framework 17 Final Rule, 88 Fed. Reg. at 14,505 ("This action will not constrain . . . the commercial fishery.").  If the HCR results in management measures that, in turn, produce an actual harvest greater than the recreational ACL, recreational AMs will be triggered, regardless of whether the commercial ACL has been exceeded.[32]

     b)  *Using AMs to Cure Recreational Overages*

Plaintiff further argues that NMFS justifies the HCR's "departure from the [ACL] mechanism" based on the availability of AMs "to remedy recreational overages when they occur," which justification is arbitrary and capricious and not in accordance with the law.  Pl.'s

---

[32] For the same reasons, even assuming that National Standard 4 applies to allocations between anglers in general and not just "residents of different states," 16 U.S.C. § 1851(a)(4), plaintiff's invocation of this standard is a nonstarter, given that the HCR does not reallocate between the commercial and recreational sectors.  Put differently, an overage of the recreational ACL is not excused when the commercial ACL is not also exceeded; rather, recreational AMs are triggered whenever the recreational ACL is exceeded.

Mem. at 33.  To support this argument, plaintiff cites NMFS's response to three commenters, *see id.* (citing Framework 17 Final Rule, 88 Fed. Reg. at 14,505), concerned that the HCR "constitutes an illegal *de facto* reallocation between sectors," in violation of National Standards, Framework 17 Final Rule, 88 Fed. Reg. at 14,505.  In response to these comments, NMFS stated, in relevant part, that: "This action will not constrain or otherwise penalize or hold the commercial fishery accountable for the recreational sector's catch.  If recreational overages occur, as they have under the previous process, the recreational fishery would be held accountable as prescribed by the AMs."  Framework 17 Final Rule, 88 Fed. Reg. at 14,505.

At the outset, when read in context, NMFS does not justify the HCR's "departure from the [ACL] mechanism" based on the availability of AMs.  Pl.'s Mem. at 33.  NMFS seeks only to explain that recreational AMs will still be triggered by overages in recreational harvest.  In any case, plaintiff's argument relies on two assumptions: first, that the HCR "decoupl[es] recreational management measures from the [RHL] and corresponding [ACL]"; and second, that AMs must "remedy recreational overages" by restoring catch to the ACL every year.  *Id.* at 33–34.  These assumptions are not grounded in the MSA, for the reasons already explained.  *See supra* Part III.B.1.a.

\* \* \*

For the reasons set forth above, the MSA does not require that annual catch limits (or ACLs), serve as the sole target and basis by which recreational management measures are developed.  Framework 17's harvest control rule (or HCR), which sets out a new approach to determine whether recreational management measures for an upcoming season should remain the same, be liberalized, or be restricted, does not violate the MSA by virtue of considering the

recreational harvest target (or RHT), in addition to the recreational harvest limit (or RHL). Accordingly, summary judgment is granted in favor of defendants on Counts 1 and 2.

### C.      2023, 2024, and 2025 Recreational Harvest Targets (Counts Three, Four, Five, and Six)

Plaintiff claims that the 2023 (Counts Three and Four), 2024, and 2025 RHTs (Counts Five and Six), which were generated using the HCR, violate the MSA and APA.  In its briefing, plaintiff appears to narrow all four claims.  For the 2023 season, plaintiff challenges the RHTs for only scup and black sea bass, and not summer flounder because, when the HCR yielded conflicting results for summer flounder, NMFS abandoned the HCR and simply maintained status quo management measures.  *See* Pl.'s Reply at 19 n.10.  For the 2024 season, plaintiff again challenges the RHTs for only scup and black sea bass, and not summer flounder because the 2024 RHT and RHL for summer flounder align.  *See* Pl.'s Suppl. Mem. at 5–6; Defs.' Suppl. Opp'n at 23.[33]

Before turning to the merits of plaintiff's claims, defendants' arguments that Counts Three and Four are moot now that the 2023 fishing season is over will first be addressed, since mootness affects this Court's subject matter jurisdiction.

#### 1.      *Mootness*

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Sandpiper Residents Ass'n v. Dep't of Hous. & Urban Dev.*, 106 F.4th 1134, 1141 (D.C. Cir. 2024) (citation omitted).  "[I]f an event occurs while a case is pending . . . that makes it impossible for the court to grant any effectual relief whatever to a

---

[33]      Indicative of the shortcomings of the current model, which uses the ACL as the only metric, summer flounder is currently subject to overfishing, *see* Determination of Overfishing or an Overfished Condition, 88 Fed. Reg. at 76,188, whereas scup and black sea bass remain in abundance.

prevailing party, the [action] must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted); *see also McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Orders of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").  When determining mootness, a court presumes that "plaintiff will 'prevail' unless her argument that the relief sought is legally available and that she is entitled to it is 'so implausible that it is insufficient to preserve jurisdiction.'"  *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin v. Chafin*, 568 U.S. 165, 174 (2013)).  As long as "there is 'any chance' that relief will be effective in securing what she seeks, she has an interest in obtaining it."  *Id.* (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019)).

This "demanding standard" to find mootness is not met here.  *Tempnology*, 587 U.S. at 377.  Although the 2023 fishing season ended on December 31, 2023, and the 2023 RHTs are no longer in effect, the 2023 RHTs were used to generate the 2024 RHTs, which were, in turn, used to set the 2024 management measures that are currently binding.  As a reminder, to develop the 2024 RHTs, the expected 2024 recreational harvest had to be estimated, using the 2023 management measures, then compared to the 2024 RHL to determine whether liberalization or restriction of the 2023 management measures was necessary for the 2024 fishing season.  In other words, the 2023 RHTs and corresponding management measures form the basis of the 2024 RHTs and corresponding management measures, and thus vacatur of the 2023 RHTs, plaintiff's requested relief, would still have consequences.[34]

---

[34]    To the extent plaintiff argues that the 2023 recreational management measures could become operative again based on the outcome of this litigation, *see* Pl.'s Suppl. Reply at 3, this argument is unpersuasive, *see Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1184 (10th Cir. 2000) (rejecting the idea that "the mere filing of a lawsuit is sufficient to resurrect Article III jurisdiction over the repealed statutes");

Defendants' principal argument in response is that "NMFS promulgated the 2024 and 2025 Recreational Management Measures for each species based on a new application of the Harvest Control Rule."  Defs.' Suppl. Opp'n at 9; *see also* Defs.' Suppl. Reply at 2 ("[E]ach application of the Harvest Control Rule yields different results depending on the facts as they exist each year.").  At the outset, this argument is belied by the record as to black sea bass.  When NMFS was unable to apply the HCR to black sea bass for the 2024 season because no new stock assessment for black sea bass was available, the 2023 management measures were carried over to the 2024 season.  *See* 2024–2025 Recreational Management Measures Proposed Rule, 89 Fed. Reg. at 13,677 ("In the absence of a new assessment this year, the Monitoring Committee, Council, and Board recommended maintaining the current 2023 measures through 2024, such that 2024 is treated as 'year two' of the management measures.").

While the HCR was newly applied to generate the 2024 recreational management measures for summer flounder and scup, as described by NMFS itself, this application used the 2023 RHT and management measures.  For scup, "[t]he median coastwide projected 2024–2025 harvest *under 2023 measures* is 15.29 million pounds."  *Id.* at 13,675 (emphasis added).  Since this estimated harvest was higher than the 2024–2025 RHL, a reduction in the 2023 management measures was recommended.  *See id.*  Since the states had developed recreational management measures expected to result in a 10-percent decrease in harvest, no change was ultimately recommended to the 2024–2025 federal management measures, meaning that the 2023 management measures were carried over for the 2024–2025 fishing seasons.  *See id.*

The default federal measures for summer flounder were calculated with similar reliance on the 2023 management measures.  "[T]he median projected harvest in 2024–2025" was

---

*Miller v. Benson*, 68 F.3d 163, 164–65 (7th Cir. 1995) (rejecting argument that a claim is not moot simply because the statutory scheme could be restored if plaintiffs prevail in the lawsuit).

estimated to be 8.88 million pounds "under status quo (i.e., 2023) measures." *Id.* at 13,676. Since this estimated harvest is greater than the 2024–2025 RHL, a reduction of the 2023 management measures for the 2024–2025 seasons was recommended and generated.[35] *See id.* In sum, the 2024 recreational management measures for summer flounder, scup, and black sea bass were each based on the 2023 recreational management measures, such that vacatur of the 2023 recreational management measures would still offer plaintiff's some, albeit minimal, relief.

Citing a plethora of cases, defendants then argue that when "a regulation has been superseded, a challenge to the earlier rule is moot." Defs.' Suppl. Opp'n at 12 (quoting *Oceana, Inc. v. Evans*, No. 4-cv-811, 2005 WL 555416, at *23 (D.D.C. Mar. 9, 2005)). Indeed, it is a "perfectly uncontroversial and well-settled principle of law [that] when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot." *Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016). Unlike the cases cited by defendants, however, the 2023 recreational management measures were not rescinded and replaced by an entirely new rule that addressed some of plaintiff's requested relief. *See, e.g.*, *New York v. Raimondo*, No. 19-cv-9380, 2021 WL 1339397, at *1–2 (S.D.N.Y. Apr. 9, 2021) (finding moot plaintiff's challenge to the 1993 Allocation Rule and its application to generate 2020 and 2021 summer flounder commercial quotas, where a new 2020 Allocation Rule was promulgated and applied to generate a new 2021 summer flounder commercial quota); *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 124 (D.D.C. 2011) (finding plaintiff's action moot

---

[35]    To the extent defendants argue that these default federal measures are irrelevant since conservation equivalency was approved for summer flounder and black sea bass, *see* Defs.' Suppl. Opp'n at 9–10, this argument fails because the combination of state or regional measures must constrain landings to the RHTs, calculated using the HCR, *see* 2024–2025 Recreational Management Measures Proposed Rule, 89 Fed. Reg. at 13,675; 2024–2025 Recreational Management Measures Final Rule, 89 Fed. Reg. at 32,374.

where "NMFS subsequently took the requested action through a new amendment or framework adjustment while the case was pending").

This leaves defendants' reliance on *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84 (1st Cir. 2002). There, the First Circuit found that plaintiff's challenge to Framework 25 of a New England Fisheries Management Council FMP was moot, given that "it ha[d] been replaced by a series of subsequent Frameworks," and "every measure introduced in Framework 25 . . . is now governed by a later Framework." *Id.* at 88. Although parts of Framework 25 were adopted as "unmodified" in the new frameworks, the First Circuit emphasized that these elements were "expressly considered and re-adopted in later Frameworks." *Id.* If the instant action involved a new framework adjustment that reconsidered and readopted the HCR, or if the 2024 recreational management measures were calculated independent of the 2023 data, *Gulf of Maine Fisherman's Alliance* would be more persuasive. The circumstances here, however, are distinguishable since, unlike in *Gulf of Maine Fisherman's Alliance*, the 2024 RHT, which was calculated based on the 2023 RHT, and the 2024 management measures, which were determined by how much the 2023 management measures needed to be adjusted, are not "based on later and totally different data." *Id.*

In sum, Counts Three and Four are not moot because vacatur of the 2023 management measures would still grant plaintiff's some relief.[36] Under the HCR, the 2024 management measures are the 2023 management measures or those measures, reduced or liberalized by a certain percentage change, which percentage change is also calculated based on the 2023 management measures. Accordingly, if the 2023 management measures were vacated, the 2024 management measures, which are currently in effect, would have to be recalculated.

---

[36] According, the parties' arguments regarding the application of the capable-of-repetition-yet-evading-review exception to mootness need not be addressed.

### 2.      *Merits*

On the merits, plaintiff's claims, in Counts Three through Six, that the 2023, 2024, and 2025 RHTs violate the MSA and APA, are substantially similar to the MSA and APA claims in Counts One and Two.   Indeed, the parties offer no new arguments, merely "incorporating by reference" their legal arguments regarding Framework 17 generally, and using the 2023, 2024, and 2025 RHTs as additional "context" to support their respective positions.   Pl.'s Suppl. Mem. at 10; *see also id.* at 15–16; Defs.' Suppl. Mem. at 18.   The additional "context" provided by plaintiff are the RHL and RHTs for summer flounder and scup for the 2023, 2024, and 2025 seasons.   *See supra* Part I.E.3–4 (describing application of the HCR to the 2023, 2024, and 2025 seasons).

Using this data, plaintiff illustrates that the HCR can result in RHTs that are greater than the RHL and argues that by setting management measures to result in the RHT, rather than the RHL, the HCR ignores the ACL's purpose as a hard limit on catch.   *See, e.g.*, Pl.'s Mem. at 26–28.   Take scup for the 2024 fishing season as an example.   The RHT was 13.76 million pounds, which was greater than the 2024 and 2025 RHLs of 13.18 million pounds and 11.84 million pounds, respectively.   Pl.'s Suppl. Mem. at 13.   When combined with dead discards, the sum is 15.91 and 15.83 million pounds for 2024 and 2025, respectively, which is greater than the recreational ACL in each of those years.   *Id.*   When the commercial ACL is then added, the total is 44.39 and 41.16 million pounds for 2024 and 2025, respectively, which values exceed the ABC for both seasons and the OFL for the 2025 season.   *Id.*; *see also* Pl.'s Reply at 17–19 (arguing the same for 2023 RHT).   Plaintiff then points out that if the RHT is treated as the RHL and used to calculate the recreational ACL, and if this newly calculated recreational ACL is then compared to the commercial ACL, the recreational ACL would account for 36 percent of the

ACL in 2024 and 40 percent of the ACL in 2025—higher than the 35 percent allocated by the FMP.  *See* Pl.'s Suppl. Mem. at 16.

Plaintiff's concern that calibrating management measures to the RHT might result in catch that exceeds the recreational ACL, and thus the ACL, ABC, and OFL, is valid as a matter of policy, but the argument is based on the assumption that RHTs are intended to be a substitute for RHLs, an assumption that is flawed for the reasons already explained.  *See supra* Part III.B.1.[37]  Whereas the RHL, having been derived from the ACL, is a limit on catch, the RHT is used to develop management measures by predicting catch.  Put another way, if the ACL is exceeded, management measures are triggered, and if the RHL is greater than the expected recreational harvest, the HCR requires management measures that reduce expected harvest.  The RHT, in contrast, is an estimated value generated in the process of setting management measures, which, if exceeded, carries no obvious consequences.

Consideration of black sea bass helps to illustrate that the RHT and RHL serve different purposes.  In the 2016, 2017, and 2018 seasons, both the recreational and commercial sectors exceeded their respective ACLs for black sea bass, with catch being so high in 2016 that it equaled the OFL.  *See* AR 1842–43.  In none of these years, however, was black sea bass deemed overfished.  Under the status quo approach, when the 2016 recreational ACL was exceeded, the 2017 management measures would have been set to target exclusively the RHL.  When the outcome of such targeting remained a recreational harvest that exceeded the 2017

---

[37]    For the 2023 season, the RHT was 12.88 million pounds and the RHL was 9.27 million pounds.  Comparison of the 2023 and 2024–2025 RHTs and RHLs supports NMFS's justification for the HCR in two respects: by illustrating that (1) the RHL can fluctuate wildly, such as from 9.27 to 13.18 million pounds between 2022 and 2023, and (2) although the RHT remains higher than the RHLs, the HCR moves the RHT closer to the RHL from year-to-year.

recreational ACL, AMs were triggered.  Put differently, under this status quo approach, the ACL served two discrete purposes, as the target of management measures, and the trigger for AMs.

The HCR changed the status quo approach by replacing the RHL with the RHT as the target of management measures, while keeping the ACL as the trigger for AMs.  As confirmed by the NS1 Guidelines and discussed in detail above, *see supra* Part III.B.1.a, this is all the MSA requires—that measures exist "to ensure accountability," 16 U.S.C. § 1853(a)(15).  Nothing in the MSA requires the RHL to serve as the exclusive target for management measures.

For the 2023 season, the first season the HCR was applied, the RHL for black sea bass was 6.57 million pounds and the expected harvest under 2022 management measures was 7.93 million pounds, and thus a restriction of catch was necessary.  *See* 2023 Recreational Management Measures Final Rule, 88 Fed. Reg. at 55,413.  The HCR recommended a 10-percent fixed reduction, resulting in a RHT of 7.14 million pounds.  *See id.*  Management measures were then calibrated to the RHT, which process involves predicting, while factoring in difficulties in predicting recreational harvest, how recreational fisheries will react to different management measures.

While the RHT is greater than the RHL, *see* Defs.' Opp'n at 18 (conceding that "a recreational harvest target may result at a level above the RHL in a given year"), plaintiff is incorrect in suggesting that the RHT is used to bypass, ignore, or supersede the RHL.  NMFS has simply chosen to accept the risk that the management measures generated using the RHT might result in actual harvest that exceeds the RHL, after consideration of several factors.  First, the 80-percent confidence interval of this RHT for an estimated harvest, is 6.45 to 7.77 million pounds, meaning that the 2023 management measures were calibrated such that the actual harvest would likely be within this range of values 80 percent of the time.  The RHL is within this 80-percent

confidence interval, making it possible that actual catch will not exceed the RHT.  Second,

benefits exist to minimizing "'the social and economic impacts of the large adjustments

sometimes implemented under the previous system that were driven by large statistical

fluctuations in the data used to estimate catch,' which were subsequently learned to be inaccurate

or unnecessary."  Defs.' Opp'n at 18 (quoting Framework 17 Final Rule, 88 Fed. Reg. at

14,501).  Third, even if the RHL is ultimately exceeded, the risk of overfishing is low, in part,

because black sea bass is classified as a "very high" stock, with a population size significantly

above the management target for this species.  *Cf. N.C. Fisheries Ass'n v. Evans*, 172 F. Supp. 2d

792, 800 (E.D. Va. 2001) ("Based on the way optimum yield is defined under Amendment 2 to

the summer flounder FMP, overages in a particular segment of the fishery from year to year do

not preclude attainment of optimum yield.").

  When the 2023 season is over, the actual harvest is calculated.  If actual catch exceeded

the RHL, AMs will be triggered, and management measures will again have to be tightened until

the RHL is reached.  To be sure, in a perfect world with perfect data, setting management

measures to target the RHL might increase the likelihood that actual harvest will be at or below

the RHL in a given year, but nothing in the MSA prohibits NMFS from striking the balance with

the approach adopted in the HCR, which still targets the RHL but uses a more cautious and

iterative approach to create more predictability and stability from year-to-year and to improve

confirmation that any distance between the RHL and actual harvest is due to recreational catch

rather than poor data.

  In sum, the additional "context" provided by plaintiff does not change the analysis above,

*see supra* Part III.B, and, for those reasons, summary judgment will be granted in favor of

defendants on Counts Three through Six.

IV.     CONCLUSION

Under the MSA, fishery management plans (or FMPs) "shall" "establish a mechanism for specifying annual catch limits. . . , at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).  FMPs must also conform to the National Standards, *see id.* § 1853(a)(1)(C), including National Standard 1, which provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," *id.* § 1851(a)(1).  All framework adjustments, in addition, must be "consistent with the fishery management plan."  *Id.* § 1854(b)(1).  None of these provisions require that annual catch limits (or ACLs), serve as the sole target and basis by which recreational management measures are developed, regardless of stock size and regardless of whether catch is expected to result in overfishing.

Framework 17's harvest control rule (or HCR) sets out a new approach for determining whether the previous year's recreational management measures should stay the same or be adjusted for the Mid-Atlantic Council's Summer Flounder, Scup, and Black Sea Bass FMP. Under the prior status quo approach, the determination of whether, and to what extent, management measures needed to be made more restrictive or liberalized to reach an expected harvest, turned exclusively on the RHL.  Under the HCR, the determination of whether management measures need adjustment still turns on the RHL, but the determination of the extent these measures should be adjusted considers not only the RHL, but also the recreational harvest target (or RHT), a value that takes into account a stock's biomass, the need for stability, and the uncertainty laden in recreational fishing data.  The introduction of the RHT changes neither the "mechanism for specifying annual catch limits" (the Specifications Framework), nor

the existence or trigger of "measures to ensure accountability" (exceeding the ACL).  *Id.*

§ 1853(a)(15).  The HCR thus does not violate the MSA simply by including consideration of the

RHT.

Accordingly, for the foregoing reasons, defendants' Cross-Motions for Summary

Judgment, ECF Nos. 30, 46, are **GRANTED**; plaintiff's Motions for Summary Judgment, ECF

Nos. 25, 42, are **DENIED**; and intervenor's Cross-Motions for Summary Judgment, ECF Nos.

27, 43, are **DENIED AS MOOT**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  September 5, 2024

_____
**BERYL A. HOWELL**
United States District Judge